[Civ. No. 15211.   Second Dist., Div. One.   July 18, 1946.]

EDWIN BURTON KELLY, Appellant, v. BERTHA MARIE KELLY, Respondent.

John N. Hurtt for Appellant.

Marcus, Rabwin & Nash for Respondent.

WHITE, J.—This is an appeal from an order of the Superior Court of Los Angeles County determining the custody of a minor child. Plaintiff father secured an interlocutory judgment of divorce in 1941, in which judgment it was provided that plaintiff and defendant have joint custody of the minor child, Patricia, then approximately three years of age, but that plaintiff have physical custody and control until otherwise ordered by the court. In September, 1942, defendant applied for a modification of the interlocutory judgment so as to grant her full custody of the child. Upon recommendation of the court investigator it was ordered on October 23, 1942, "that the plaintiff shall continue with the custody, care and control of the minor child until further order of the court." In October, 1944, defendant filed an affidavit, entitled "Modification Questionnaire," whereupon an order to show cause why the order of October 23, 1942, should not be modified was issued. In this proceeding plaintiff filed a counteraffidavit, and hearings on the order to show cause were had at intervals from November, 1944, to June, 1945. On July 24, 1945, the trial court entered its order "that until further order of this Court, both parents are fit and proper persons to have the custody of said minor child, Patricia Kelly, and said parents are awarded the joint custody of said minor child, with physical custody of said minor child in the mother, . . ." The court further ordered that the mother have the child during the school term and the father during the vacation periods; and that the father be "entitled to reasonable visitation of said minor child during the period of time that said minor child is with the mother." From the foregoing order of July 24, 1945, plaintiff father prosecutes this appeal.

Appellant contends (1) that neither the facts stated in plaintiff's modification questionnaire nor the evidence adduced by her at the hearing justified changing the physical custody of the child from the father to the mother, and (2) that upon the entire evidence, the trial court abused its discretion in so doing.

The rules generally applicable to the situation here presented are well settled. Section 138, subdivision 2, of the Civil Code, provides: "In actions for divorce the court may,

during the pendency of the action, or at the final hearing or at any time thereafter during the minority of any of the children of the marriage, make such order for the custody, care, education, maintenance and support of such minor children as may seem necessary or proper, and may at any time modify or vacate the same. In awarding the custody the court is to be guided by the following considerations:

''(1) By what appears to be for the best interest of the child in respect to its temporal and its mental and moral welfare; and if the child is of a sufficient age to form an intelligent preference, the court may consider that preference in determining the question;

''(2) As between parents adversely claiming the custody neither parent is entitled to it as of right; but other things being equal, if the child is of tender years, it should be given to the mother; if it is of an age to require education and preparation for labor and business, then to the father.''

█ It has been held that one who seeks a modification of an existing custody order has the burden of proving that conditions have so changed that a modification is justified (*Prouty* v. *Prouty*, 16 Cal.2d 190, 193 [105 P.2d 295]). However, as was said in *Peterson* v. *Peterson*, 64 Cal.App.2d 631, 633 [149 P.2d 206], ''The rule of 'changed circumstances' might well be termed a creature of judicial expediency. It is not statutory. It is a means to end the turmoil of litigation so often attendant with matters involving questions of custody and to make it impossible for a dissatisfied party to keep the courts continually occupied with his or her grievances concerning former orders. Accordingly, the courts have generally held that in absence of a showing of some change in circumstances making it advisable from the standpoint of the welfare of the child that the former order be modified, a request for a modification will be refused.

''However, that is not to say that the courts have no jurisdiction to modify previous orders in the absence of such a showing nor do the decisions wherein the rule is enunciated 'deny the power of the court to make such modification of its orders relative to the custody of children.' (*Bogardus* v. *Bogardus*, 102 Cal.App. 503, 506 [283 P. 127].)''

█ An application to change the custody of a child from one parent to the other is addressed to the sound discretion of the trial judge and his order will not be reversed except on a clear showing of a breach of that discretion. (*Bancroft* v.

*Bancroft,* 178 Cal. 352 [173 P. 582] ; *Foster* v. *Foster,* 8 Cal. 2d 719, 730 [68 P. 2d 719] ; *Baldwin* v. *Baldwin,* 111 Cal.App. 148 [295 P. 93].)

The affidavit of respondent mother by which the instant proceeding was initiated contained the following:

". . . That since said order (of October 23, 1942) was made the conditions and circumstances surrounding the parties, and upon which said order was based, have materially changed, in this: . . . That since said order was made affiant has married Charles Webber who is a Chief Petty Officer in the United States Coast Guard permanently located at San Pedro, California. That your affiant and Mr. Webber have purchased a home located at 710 Grandee Street, Compton, California which is a single family residence, well furnished, and containing two bedrooms. That Mr. Webber is home every night and is anxious to have the custody of affiant's daughter changed to affiant and to accept said minor child into the home and treat said minor child as his own. That affiant and her husband have ample means to provide for said minor child. . . ."

In opposition to the mother's application, plaintiff father filed a counteraffidavit, alleging that at the time of the interlocutory decree and of the making of the order of October 23, 1942, "it appeared, and Margaret C. Harpstrite, an investigator of this court found, that defendant was a manic depressive and not a fit and proper person to have the custody of said minor child; that in addition to defendant being unstable mentally, she consumed large quantities of intoxicating liquors on various occasions, and that she was quite likely to do so if she had said child in her custody and control." The father's affidavit also contained allegations that defendant has continued to be a manic depressive and to consume large quantities of liquor; that defendant stated to plaintiff and others that she knew she was not a fit person to have custody, but intended to annoy plaintiff; that she failed to exercise her right of visitation except at infrequent intervals; that defendant on Christmas 1943, while temporarily having custody of the child, was found in bed in a state of extreme intoxication. Plaintiff further alleged that he was remarried, had a child by this marriage; that the minor child here involved was very happy at plaintiff's home and did not desire to live with defendant.

On behalf of the defendant, the court investigator, Mrs.

Harpstrite, testified: "When I first recommended to the court that Mr. Kelly continue with the custody, care and control of the child, that opinion and that recommendation was based solely upon a report that I had from the State Hospital in Missouri. At that time I felt that Mrs. Kelly was in no mental or physical condition to have the custody of the child. There was nothing regarding her unfitness. I felt that she was a good mother if she could more or less rehabilitate herself and stabilize herself. That is the only reason that I made that type of recommendation, because I felt that she loved her baby and she had her interest at heart, but the odds were just against her at that time. . . ."

The report referred to was a letter from State Hospital No. 2 in Missouri, in reply to the inquiry from Mrs. Harpstrite, the court investigator, in which letter it was stated:

"Mrs. Bertha Marie Kelly was admitted as a patient here on October 8, 1941 . . . released on parole November 16, 1941 . . . discharged as improved on August 8, 1942 . . . she also had a sister who was a patient here . . . we have no information about her addiction to alcohol . . . her history states that she has been treated at the Alamitos Sanitarium at Long Beach, California. . . . Our diagnosis was manic depressive psychosis of the manic type. . . . She exhibited a considerable degree of psycho-motor over-activity and also numerous delusions. . . . Our experience with her was that she was not at all truthful about things pertaining to her ailment. . . . Shortly before coming here she had an abortion which was induced. . . . It is the nature of the manic depressive group to recur, but the present intervals in which the patient is relatively normal . . . we would not consider her case exceptionally favorable, and future mental lapses are almost certain to present themselves."

The defendant in her own behalf testified to her marriage with Mr. Webber August 5, 1944; their purchase of a home; that she had not been drinking—"I did some after 1942, after the custody case"—but after that "very little"; denied that she was drunk on Christmas of 1943, as asserted by plaintiff; that between October, 1942, and April, 1944, she had taken a drink "approximately three times," but that they kept no liquor in their home. She testified that she married a Mr. Cameron in January, 1943, which marriage was annulled because of his drinking and because "we had never lived together"; that Mr. Cameron was drunk when he arrived home from his

first voyage on Christmas, 1943, and occupied the same room with her and the child. The witness denied that she had ever admitted her unfitness or that she had ever threatened to seek custody for the purpose of annoying the plaintiff.

Dr. Thompson, a qualified psychiatrist, testified that he examined defendant on April 3, and April 10, 1943; that he found no evidence of mental disorder. He also testified that a reexamination on February 10, 1945, evidenced no symptoms of mental disorder and that nothing in his examination disclosed any tendencies which would make her an unfit person to have the custody of her 6-year-old daughter. Under examination by the court the doctor testified, in part: "From the story that I have gotten she has been apparently normal mentally for more than three years and her illness was apparently precipitated by domestic difficulty, alcohol, financial difficulty, business troubles, and trouble with her mother, all of those factors. With those things removed I think the outlook is very good for a stable life, and I think she has excellent qualities so far as her personality is concerned. I think it is entirely a matter of the way your Honor looks at it. . . ."

Another psychiatrist examined defendant during the pendency of the hearing, and "found no evidence of psychosis." From the history given him by defendant, he could not say whether there would be a recurrence of the psychosis which she had at the time of her stay in the Missouri State Hospital, but that "statistically manic depressive psychosis in a majority of cases shows a tendency to recurrence"; that he would have "some reasonable doubt" about whether a mother subject to manic depressive psychosis with a likelihood of recurrence would be as well fitted to care for a child of tender years as one of normal mentality.

The minor child, who was between 6½ and 7 years of age at the time of the hearing, was examined by the trial judge in chambers. She stated that she wanted to live with her stepmother and father because her mother would not let her go to the store or for a walk. "Just let me stay at the house and not play with any of the kids and stuff like that." To the question, "Wouldn't you like to go over there and live with your real mother for a while and see how it works out?" the child replied, "I will go and visit her for about three days and see how it is." She stated that she liked her mother, but would rather live with her father; that she would like to visit her mother week-ends, but would not like to spend the summer

vacation with her. The child volunteered the information that "if I do (live with her mother) and then I go and visit Pat and Burt (her stepmother and father) she always starts crying, and says she is going to be an angel, and that makes me start crying too."

Conceding there is much to be said in support of the view that the trial court did not pursue the safest course to protect the "best interest of the child in respect to its temporal and its mental and moral welfare" (Civ. Code, § 138), we are limited to a determination of whether the trial judge, who had the benefit of personally seeing and hearing all the parties to the controversy, clearly abused his discretion in view of all the evidence before him. In other words, was there substantial evidence of the mother's physical and mental rehabilitation and was her condition of health such that she was entitled to claim the benefit of the qualification contained in the Civil Code section, *supra*, which reads, "but other things being equal, if the child is of tender years, it should be given to the mother . . ."?

From a reading of the record herein it is at once apparent that at the time physical custody of the child was awarded the father such action was not taken by the court because of a belief that the mother was morally unfit to have such custody, but only because the court believed the mother to be temporarily incapacitated by illness to assume such responsibility. This is indicated by that portion of the interlocutory judgment which provided that both the father and mother have joint custody of the child and the further fact that it was provided therein that physical custody should be reposed in the father "until otherwise ordered by the court." Judge Paonessa, who granted the interlocutory judgment, testified at the hearing which gave rise to this appeal, and in his testimony we find the following:

"The parties testified in my court and I found that both, as far as I was concerned, were fit parents for the purpose of having the custody of the child. Therefore, I awarded joint custody. I found that the mother at the time was emotionally upset, she was ill, she was in no condition to take care of the child, she had no home for it, no way of providing for its care. She had to work in the daytime and many times at night; as I recall it, she testified she was giving dancing lessons. The husband stated that he was then living in San Bernardino, that he had his folks that would be able to take

care of the child, he had a home that was fit for the child at that time. And I stated to them that until such time as she was able to take care of the child she should petition the court for a change of custody, and I deliberately made it joint custody so that she would not come under the rule which says that an award is made to one person because the other person was not a fit parent. I found that both were fit, but temporarily the mother was in no position to take care of the child compared with the ability of the father who had a home to take care of that child. I think I stated to the parties then that if there should ever be any change in her circumstances that she should petition the court for a change in the physical custody. That is the reason I put in this wording here, 'until further order of the court,' to leave it open for the court to continue to hold jurisdiction over the physical custody.''

We do not therefore feel that the instant case is one where the so-called rule of ''changed circumstances'' should be determinative, but that the decision should rest upon the inherent statutory power of the court to make such orders relative to the custody of children ''as may seem necessary or proper'' and to ''at any time modify or vacate the same'' (Civ. Code, § 138). We are impressed that the ''changed circumstances'' rule, which is not statutory, is resorted to in those cases where the court has originally determined that the child should be in the custody of one of the parents because of the unfitness of the other to have such custody, if the best interests of the child, temporally, mentally and morally are to be conserved; and not to cases such as the instant one where the court found both parents to be fit, awarded them both custody, but provided for physical custody in the father because of the existing mental and physical infirmities with which the mother was afflicted.

In any event, the ''changed circumstances'' rule is not ironclad and one to which there can be ''no possible exceptions.'' (*Foster* v. *Foster, supra,* p. 728.) It seems to us that the question of ''changed circumstances'' is but another form of evidence which the court may consider in the exercise of its discretion to hear and decide the question of modification of custody orders previously made. But notwithstanding ''changed circumstances,'' there can be no doubt that once jurisdiction attaches to grant a divorce and award custody of

416

the minor children of the marriage, our statute provides that such jurisdiction is continuing and the power to amend, modify or annul an award of custody as existing conditions demand ever after remains. (*Foster* v. *Foster, supra,* p. 726.) The reasoning which dictated adoption by the courts of the so-called rule of "changed circumstances" is thus epitomized in *Foster* v. *Foster, supra,* at page 727, where the court, after announcing the rule of law we have just mentioned, stated: " 'But this does not mean the parties to such litigation may after a court has once heard evidence upon the subject of their fitness to act and ruled upon the question, immediately again invoke the powers of the court to have it inquire into the same or other facts existing at the time of or prior to the former decree. Such holding would lay a foundation for interminable and vexatious litigation. The rule is stated to be that to justify a modification there must be a change of circumstances arising after the original decree is entered, or at least a showing that the facts were unknown to the party urging them at the time of the prior order, and could not with due diligence have been ascertained. (19 Cor.Jur. 350.)' '' The so-called rule means only that the action of the court in refusing to modify an order of custody unless there is a showing of "changed circumstances" does not amount to an abuse of discretion.

Regardless of "changed circumstances," the paramount concern of the court is the welfare and best interests of the child; and both the award of custody and any application for modification of such award must be addressed to the sound discretion of the trial court, subject of course to the qualifications contained in section 138, subdivision 2, of the Civil Code. In *Taber* v. *Taber,* 209 Cal. 755, 757 [290 P. 36], the Supreme Court said: "In *Simmons* v. *Simmons,* 22 Cal.App. 448, 451 [134 P. 791], it is said: 'It is manifest that the legislature . . . intended to confide to trial courts, in the disposition of the minor children of the parties to divorce actions, a very extensive discretion, with a view to the conservation of the highest and best interests of such minors, and the conclusion arrived at by such courts in such cases will not be set aside unless the record discloses a clear abuse of that discretion.' In *In re Johnson,* 101 Cal.App. 110 [281 P. 435], is is stated: 'It is not alone the rights of the parents but the welfare of the child that is presented for determination, and for that

reason a wider discretion is afforded the courts in dealing with matters pertaining to children than in many other cases.' One of the leading cases on the subject is *Crater* v. *Crater,* 135 Cal. 633, 634 [67 P. 1049, 1050], wherein the court discussed the rule as follows: 'The good of the child is regarded as the controlling force in directing its custody, and the courts will always look to this rather than to the whims and caprices of the parties. The morals of the parents, their financial condition, their subsequent marriage, the age of the child, and the devotion of either parent to its best interests are all factors to be weighed and considered by the court. All such applications are addressed to the sound legal discretion of the court below, and its conclusion will not be disturbed here, except it should clearly appear that its discretion has been abused.' '' And in the case of *Prouty* v. *Prouty,* 16 Cal.2d 190, 194 [105 P.2d 295], it was said: ''The question as to whether a parent is a fit or proper person to have the custody of a minor child refers, however, to his or her fitness at the time of the hearing, and is not necessarily controlled by conduct many years prior thereto.''

It is not a question of whether we agree with the action taken by the trial court, but, as heretofore stated, we are restricted to a determination of whether the record is so barren of substantial evidence to support the order made as to stricture the same as a clear abuse of discretion. The record herein discloses no such abuse of discretion as would warrant this court in reversing the decision of the trial court. There is present evidence that the mother has regained her health mentally and physically; that she has remarried, has established a home; that her husband is desirous of taking the minor child into that home. There is also evidence that the mother is devoted to the child, and can and will not only give her a good and suitable home, but proper care as well. Nor can we be unmindful of the mandate of section 138, subdivision 2, of the Civil Code, which provides that, other things being equal, if the child is of tender years its custody should be given to the mother. The order here made permits the father to have reasonable visitations with the child while she is with her mother and to have physical custody of the child during school vacation periods.

For the foregoing reasons, the order is affirmed.

York, P. J., concurred.

DORAN, J.—I concur, but, in my judgment the so-called "changed circumstances rule," is neither in fact nor in law, a rule. The law with regard to the power of the court in such circumstances is well established. The introduction of additional evidence resulting from any change in the status of the parties in no sense establishes a "rule." Whether the court's discretion has been abused still remains the sole test.