[Civ. No. 18147. Second Dist., Div. Three. July 16, 1951.]

MARVEL M. SORRELS, Appellant, v. CARL W. SORRELS, Respondent.

Walker W. Downs for Appellant.

Carter, Young, Zetterberg & Henrie and Richard T. Young for Respondent.

VALLÉE, J.—Appeals by plaintiff-wife from (1) an order modifying interlocutory and final decrees of divorce by changing the custody of the minor son of the parties, aged 3, from the mother to the father, and (2) an order denying her motion for attorney's fees and costs on appeal from the foregoing order.

The parties married April 5, 1946, and separated April 19, 1948. On the latter date they entered into a property settlement agreement, wherein they agreed it was "to the best

interest" of the minor child, then 1 year of age, that the wife should have his full custody and control, the husband to pay $50 a month for his support, as well as medical and dental expenses, and to have the right of reasonable visitation. Plaintiff filed an action for divorce on April 22, 1948, on the ground of cruelty, in which it was alleged that the custody and control of the child was then in the plaintiff "who is a fit and proper person to have and be awarded the custody of said child." The husband defaulted, and on June 22, 1948, an interlocutory decree was granted plaintiff, the custody of the child awarded to her, and defendant ordered to pay $50 a month for his support, and his medical and dental expenses. The final decree, entered June 30, 1949, incorporated the provisions of the interlocutory decree respecting the custody and support of the child.

On February 3, 1950, defendant filed an affidavit seeking modification of the decrees as to custody of the child on the ground that plaintiff was unfit to have custody, that conditions had changed since the order was made, and that a change would be for the best interest of the child. The matter was contested. The court found that plaintiff was not, and defendant was, a fit and proper person to have custody of the child, and that it was for the best interest and welfare of the child that his custody be awarded to defendant. Plaintiff was given permission to visit the child at San Jacinto, California, each Saturday, from noon to 5 o'clock "provided however, that said child shall not be taken from San Jacinto." Plaintiff was also given the right to have the child visit her at her home in Los Angeles for two weeks during the Christmas vacation. The interlocutory and final decrees were thereupon modified and defendant relieved from further support payments for the child.

Plaintiff contends that the evidence is insufficient to show (1) that she is not a fit and proper person to have custody of the child, (2) a change of conditions justifying a change of custody, and (3) that the welfare of the child required a change of custody. Her contentions are well taken.

As between parents adversely claiming the custody of a minor child "neither is entitled to it as of right; but other things being equal, if the child is of tender years, it should be given to the mother." (Civ. Code, § 138(2).) "The 'other things' that are to be weighed and considered are a good home, congenial surroundings, intelligent attention and direction in matters affecting the health, growth and development of the children—these are the principal advantages that must

be looked for. The court has a broad discretion in determining whether such advantages are offered by the respective parents, and whether they are equal, but if the evidence clearly establishes that the children will have equal advantages in the home of the mother and that the mother has demonstrated her ability and willingness to perform her maternal duties properly, the law requires that young children be placed with her." (*Bemis* v. *Bemis*, 89 Cal.App.2d 80, 83 [200 P.2d 84].)

Generally, "until some change of circumstances arises which makes a modification of the former order of custody advisable from the point of view of the welfare of the child, the court will give effect to the former order and will refuse to make any modification of such order." (*Foster* v. *Foster*, 8 Cal.2d 719, 726 [68 P.2d 719]; *Johnson* v. *Johnson*, 72 Cal.App.2d 721, 723 [165 P.2d 552].) It is well established that "the courts are reluctant to order a change of custody and will not do so except for imperative reasons; that it is desirable that there be an end to litigation and undesirable to change the child's established mode of living; that ordinarily a change will not be ordered for alleged unfitness of the one having custody without a showing that the welfare of the child clearly requires it. (See *Washburn* v. *Washburn*, 49 Cal.App.2d 581, 587 [122 P.2d 96].)" (*Bemis* v. *Bemis*, *supra*, 89 Cal.App.2d 80, 90.) The paramount consideration is, however, the welfare and best interest of the child.

The evidence reveals that both parents have great affection for the child and he for them; and that at the time of the hearing both parents were able to offer the child a good home, a yard to play in, their own personal care, love, and attention during the day as well as night, and the love and affection of those strangers with whom the child would come in daily contact, namely, the stepfather if the child were permitted to remain in the custody of his mother, or defendant's uncle and aunt in the event custody was awarded to the father. We think it clear that the advantages which the child would receive in the home of his mother were equal to those of the father, and in view of the child's tender years—3—his custody should be with his mother unless it has been shown that she is no longer a fit and proper person to have such custody. We are unable to find any substantial evidence supporting the court's finding of unfitness.

In determining the fitness of a parent to have the custody of a child, his or her fitness at the time of the hearing is controlling. (*Prouty* v. *Prouty*, 16 Cal.2d 190, 194 [105 P.2d 295]), as it relates to the welfare of the child.

■ Two incidents which occurred some eight months prior to the date of the hearing, and during a brief six-week period in which the parties attempted a reconciliation after the interlocutory decree, were relied upon by defendant as evidence of plaintiff's unfitness. No evidence was offered with respect to plaintiff's personal acts or conduct during any other period from the date of the interlocutory decree to the date of the hearing. Plaintiff was away from the home of the parties at the time the two incidents occurred. On both of these occasions she had left the child at home in the care of a responsible person—with defendant on one occasion, and with a competent baby sitter on the other. Mrs. Owens, a witness for defendant, testified that on the night defendant was home caring for the child, plaintiff appeared at a country club where she, Mrs. Owens, was working as a hat check girl and "spent most of the time talking with me." Plaintiff then went to the bar, where she met two boys. They asked Mrs. Owens to go with them to Crestline. Mrs. Owens testified: "I didn't particularly want to. So while I was making up my mind, I drove my car to Pomona and they got in Marvel's [plaintiff's] car . . . and drove along beside me. And when we got to Pomona, I just went on home, and the last I saw they were parked on Fifth Avenue." There is nothing in this testimony which indicates that on this occasion plaintiff did not conduct herself in other than a fit and proper manner. Plaintiff explained that the two boys were classmates of hers; one of them wanted a ride into town; she took him, and immediately went home. The explanation was a reasonable one, and not controverted. The second incident occurred while defendant was away on an overnight fishing trip with several men, including Mrs. Owens' husband. Mrs. Owens testified that she and plaintiff decided they, too, would go out in the evening and that plaintiff would stay overnight with her. Plaintiff's child and the 9-year-old daughter of Mrs. Owens were left in charge of the same baby sitter. The two women drove to a bar in Maywood and while there met Leonard Drumm and another man. Plaintiff had known Leonard Drumm, who is now her husband, and had gone out with him after the interlocutory decree. He drove the four of them to his apartment for a drink and to listen to the radio. His apartment consisted of one room and a kitchen. The room had only a davenport and a bed in it. There were no chairs. Mrs. Owens and the other man sat on the davenport. There is a conflict as to whether plaintiff and Drumm sat down or "laid" down on the bed while in the presence of the other two. In either

event, Mrs. Owens did not testify that they conducted them-selves improperly. Mrs. Owens then wanted to go home, and Drumm drove the four of them back to where her car and the other man's car were parked, and Mrs. Owens drove home alone. Drumm testified that he and plaintiff then drove to the beach for awhile, and later he took her to her aunt's home in Maywood where she stayed overnight. Both Drumm and plaintiff testified that he picked her up the next morning and drove her back to Mrs. Owens' home. Plaintiff asked Mrs. Owens not to tell defendant where she had been but to say she had been with her. Defendant testified that Mrs. Owens informed him of this incident shortly after it happened and that plaintiff also admitted to him that she had stayed all night with Drumm. This was in direct conflict with the testi-mony offered by plaintiff and Drumm that plaintiff had stayed overnight with her aunt. Accepting defendant's testimony, as we must in view of the conflict, defendant did not consider that her conduct rendered her unfit as a mother, for he testi-fied that he ''was willing to overlook it if we could keep right on going and making a go of it.''

Whatever may be said of plaintiff's conduct, there is no showing that plaintiff neglected any of her maternal duties toward the child at either of these times or at any other time. ''[A]cts and conduct of one of the parties to the divorce which gives offense to the other, or even to the public at large, are not a matter that calls for or permits a change of custody unless such acts and conduct are shown to affect directly the welfare and best interests of the child. Where a court has decreed custody to one parent, such parent may not be deprived of the custody for any supposed unfitness unless it be shown that he or she is so unfit as to endanger the child's welfare. A custody proceeding is not one to discipline one parent for such parent's shortcoming as an *individual,* nor to reward the other for any wrong suffered therefrom.'' (*Washburn* v. *Washburn,* 49 Cal.App.2d 581, 587-8 [122 P.2d 96].) As we have said, the child was not left alone on either of these two occasions. He was left in competent care. There is evidence which unequivocally shows that plaintiff was a fit mother. Mrs. Owens, defendant's witness, testified as fol-lows: ''Q. To your knowledge was Van ever left alone on any occasion? A. I don't think he was. Q. Have you observed the conduct of Mrs. Sorrels toward Van? A. Yes, sir, she seemed to love her child. Q. Did she always show the child a lot of attention? A. As much as a mother is supposed to,

I guess, like any mother does. Q. Did she keep the child clean? A. Yes, sir. Q. Did she feed the child regularly? A. As far as I know. Q. In all respects, did she care for the child as well as you cared for yours? A. Yes, sir.''

Defendant was asked by his attorney to state what plaintiff did, or failed to do, in taking care of the child, during the attempted reconciliation period, and answered: ''She took good care of the child when she was home, but she wasn't home much.'' Plaintiff's attorney questioned defendant as follows: ''Q. Have you at any time seen Mrs. Sorrels abuse the child? A. No, because when I would go after the baby, she wouldn't be there. Q. When she was home, insofar as you could observe, did she feed the child when he should be fed? A. Yes, she has always fed the child when he should be fed. Q. Did she keep the child clean? A. Yes. Q. She was a good mother in all respects, except at the time she wasn't at home; is that correct? A. She was a good mother, except she wouldn't keep the baby with her.''

The statement that plaintiff ''wasn't home much'' had reference to the six-week period of the attempted reconciliation. During the first two weeks of this period plaintiff stayed at home and took care of the baby; but because of an indebtedness of about $700, incurred as a result of a major operation she had had after the separation, she felt compelled to go to work to pay her debts. Her first job was as a waitress, working from 6 p.m. until midnight. Defendant objected to this job and plaintiff quit after about a week or a week and a half. Defendant testified he then told plaintiff that *''if you had to work, I would try to get her a job some place else.* So she went to work at Whalen's Drug Store in the day time, and had a friend of ours come over and get the baby in the morning and take care of him. And I would get off work at 4:00 o'clock and pick the baby up and take him home and give him his supper and get her at 7:00.'' Both parties continued to work until the time the reconciliation failed, some four weeks later.

A month after the interlocutory decree plaintiff placed the child in the care of a Mr. and Mrs. Stanton who had two children of their own. The Stantons had been recommended to plaintiff by the wife of the minister of the First Christian Church of Bell. The child remained with the Stantons for approximately a year and a half—from about June, 1948, to February 11, 1950—not including the six-week period he was with his own parents. It was conceded that he received the very best of care while with the Stantons. Defendant testi-

fied they were ''a fine couple'' and ''[t]hey have given him the best care two people can give a baby. . . . They have done everything they could, except they are not the mother and father of the baby.''

It seems to be defendant's contention that because plaintiff boarded the child out full time, and did not do so under a day-nursery plan whereby she could have the child with her nights, she was neglectful in her maternal duties and thus unfit to have the child's custody. Defendant admitted that plaintiff was compelled to support herself after the divorce. The property settlement agreement made no provision for alimony other than the sum of $50 for plaintiff's ''support during the time that she is obtaining employment.'' No alimony was asked for in the divorce action and none was awarded. Economic necessity compelled plaintiff to work. Having no other place to keep the child, she did what she considered best under the circumstances,—placed him in the care of persons who had been recommended to her by her minister's wife, and rented a room for herself. Plaintiff did what any other working mother would have done under similar circumstances.

The fact that a divorced working mother is impelled by circumstances to relinquish the physical care of her child when boarding him, is not, in itself, indicative of a relinquishment of her power and duty of supervision over her child. There was no showing here that plaintiff surrendered anything other than the physical care of the child when she left him with the Stantons. The evidence shows she visited the child every day when her work permitted, and when it did not, she visited him two or three times a week and had him with her on alternate Sundays (defendant had him the other Sundays) ; she lavished love and affection upon him ; was concerned over his welfare and health ; saw to it that he was regularly taken, either by herself or her mother, or by Mrs. Stanton, to the pediatrician who had attended him since birth ; saw to it that he received all of the recommended immunizations and vaccinations ; and, perhaps most important, was exceedingly careful in her selection of the persons in whose care she was entrusting the physical care of her child.

As further illustrative of plaintiff's unwillingness to assume and perform her proper maternal duties, defendant argues that plaintiff permitted the child to remain with the Stantons for a period of a little over two months following her remarriage. Plaintiff testified that she had continued working after her marriage in order to ''clear up'' about $200 of the bills

she had incurred as a result of her operation, that she did not feel that her new husband "should pay for them. They were mine. I had them before I met him." Under the circumstances this fact does not show neglect of the child. At the time of the hearing plaintiff was no longer working, the child was living with his mother and stepfather, and she was devoting her full time and attention to his care.

Defendant admitted that during the reconciliation period he slapped plaintiff while she had the child in her arms. He admitted he had been drunk a couple of times. He testified: "I have a bottle of beer once in awhile, and I have been drunk a couple of times. I have never been drunk enough that I couldn't walk. I don't mean drunk,—I have had a few drinks where I feel happy, and so does everybody else."

Considering the age of the child and the record, we are of the opinion it was an abuse of discretion to modify the custody provisions of the decrees. (See *Bemis* v. *Bemis,* 89 Cal.App.2d 80 [200 P.2d 84]; *Juri* v. *Juri,* 69 Cal.App.2d 773 [160 P.2d 73]; *Moon* v. *Moon,* 62 Cal.App.2d 185 [144 P.2d 596]; *Washburn* v. *Washburn,* 49 Cal.App.2d 581 [122 P.2d 96].)

Plaintiff also appealed from an order denying her motion for allowance of attorney's fees and costs on the appeal from the order modifying the decrees. The court erred in denying plaintiff's motion. From what has been said, it appears that the appeal was meritorious and taken in good faith. The evidence on the hearing of the motion showed that plaintiff did not have the funds necessary to prosecute the appeal or to pay attorney's fees, and that defendant was in a position financially to pay a reasonable sum therefor. It is plain that the refusal to make plaintiff a reasonable allowance to prosecute the appeal was an abuse of discretion. (*Kyne* v. *Kyne,* 74 Cal.App.2d 563, 568-9 [169 P.2d 272]; *Norris* v. *Norris,* 50 Cal.App.2d 726, 735 [123 P.2d 847]; *Coleman* v. *Coleman,* 23 Cal.App. 423, 426 [138 P. 362].)

The order modifying the interlocutory and final decrees of divorce is reversed. The order denying plaintiff's motion for costs and attorney's fees on appeal is reversed with directions to allow plaintiff a reasonable sum therefor.

Shinn, P. J., and Wood (Parker), J., concurred.

A petition for a rehearing was denied August 2, 1951, and respondent's petition for a hearing by the Supreme Court was denied September 13, 1951. Schauer, J., and Spence, J., voted for a hearing.