[Civ. No. 19206. First Dist., Div. One. Feb. 23, 1961.]

LEONA STACK, Appellant, v. JOHN J. STACK, JR., Respondent.

Myer M. Penn for Appellant.

Silverstein, Rose & Lempres and Leon G. Seyranian for Respondent.

DUNIWAY, J.—This case illustrates the almost impossible position in which an appellate court is placed when it is called upon to review an order of the superior court transferring the custody of a child from one of two divorced parents to the other.

## Chronology

The interlocutory decree was granted on July 25, 1951. At that time the child, Candi, was just over 2 years old. The final decree was granted on August 11, 1952. Both decrees granted custody of the child to the mother, with the father having the right to have the child visit him each Sunday between 11 a. m. and 7 p. m. He was required to pay $50 per month for her support. No alimony was granted the mother. The child continued in the custody of her mother until the father's motion to modify the decree was granted on September 22, 1959, at which time she was 10 years old. The mother appealed on October 13, 1959.

The appellant's opening brief was filed on March 16 and her closing brief on September 2, 1960. The matter was heard by this court and submitted for decision on January 4, 1961. No stay was requested and consequently the child has now been in the custody of the father for approximately 16 months. The order of September 22, 1959, transferred custody of the child to the father, but gave the mother visiting rights during the summer up to a period of eight weeks, with the further provision that if the child visits the mother outside the state, she is to pay the cost of transporting the child to her place of residence, and the father is to pay the cost of transporting the child back to his residence.

The hearing was held September 11, 1959. We have before us no information whatever as to how the court's order of September 22, 1959, has worked out in practice. We were advised at the oral argument that a contemplated move of the mother and her new husband to Kansas did not take place, but that these parties have remained in the Bay Area in order to enable the mother to be near her child, and that she has had Candi with her every other week end and during the summer.

## The Practical Problem

It may be that the court's order has worked out well; it may have been detrimental to the child and the parents. We have no way of knowing. Every decision dealing with this question starts with the primary object to be achieved, which is the welfare of the child. How can an appellate court, 16 months or more after the order is made, take any intelligent action? If we were to reverse, we would change a "status quo" of 16 months' duration without having any knowledge as to what the current situation is. Had a stay been granted, the same problem would arise upon affirmance.

## The Grounds for the Order

The grounds of the father's motion were stated in his affidavit to be change of circumstances in that, since the time of the final decree, the mother had remarried and on March 15, 1959, obtained an interlocutory decree of divorce in California from her second husband; that on June 6, 1959, she obtained a Mexican divorce from the same man; that on June 24, 1959, she married her present husband (Shettler); that her present and future residence are uncertain; that during the preceding three years the child had spent each summer with her father "and his new family"; that the father has remarried, has a young child by his new wife and has an adequate home; that the mother and sister of the child's mother have found the child improperly cared for and have asked the father to obtain custody. In opposition, the mother said by affidavit that she had remarried on June 24, 1959; that the child has been properly cared for; that she can provide the child with a proper home, schooling and facilities, and that the child wants to stay with the mother.

The court grounded its order upon change of circumstances, but did not specify what the changed circumstances are.

## The Facts

As compared to most contests as to custody of a child, the hearing was an amicable one. The court had before it the mother, the mother's present husband, the father, the father's present wife, and the paternal grandmother. The father's counsel offered testimony of a sister of the mother and asked for a continuance to produce the maternal grandmother under a subpoena. The court indicated that it did not desire to hear this testimony because it felt that it should not do anything to cause hurt feelings in the family. We summarize the facts brought out at the hearing, stating the facts most favorable to the father, where there is any conflict in the evidence.

*a. The child's preference.*

The court stated that it would not ask the child as to her preference in the matter. No evidence other than the uncontradicted statement in the mother's affidavit was received as to the child's desire.

*b. The child.*

Candi was at the time of the hearing about 10 years old; her grades in school have been "nothing spectacular, they were just passing." She had just been promoted to the high fifth grade. She had had three school transfers in four years.

The mother had had no disciplinary problems except for a short period after each summer, when Candi returned from spending the vacation with the father or the father's mother. The mother described Candi as a typical 10-year-old child who is smart and "will play one against the other." The child testified briefly and, in response to questions from the court, said that she loves her mother and dad and her grandmothers and uncles.

There was testimony that when Candi was picked up by the father her physical "condition was not pleasing to see"; that she was a "very unkept [sic] child"; that her clothing was not properly taken care of; that she "was not properly bathed"; "her feet . . . was dirty. Toenails weren't clean. Fingernails weren't clean; her hair wasn't washed." This was true "ninety percent of the time." ". . . most times she has colds. . . . Other than that, her teeth is the only other implement which is not in very good condition." The father has provided some dental care. The mother testified that Candi had had no serious illness; that when she returned after visits to her father or her father's relatives, she was generally very clean but would sometimes come home with sniffles; that she sometimes had a cold when her father picked her up. The paternal grandmother testified that sometimes when Candi was picked up her clothes were not clean, and her person was dirty, including her ears and her feet.

The foregoing is the only evidence indicating any physical neglect of the child.

*c. The mother.*

After the divorce she had to work because she received no alimony from the father. She first worked as a cashier in the St. Francis Theater in San Francisco, and then at Hunter's Point shipyard in a clerical capacity until June 19, 1959. She has lived in San Francisco throughout the time that she has had the custody of Candi, at three different addresses. She first remarried on October 30, 1954 or 1955. The allegations in the husband's affidavit as to her divorce and remarriage are correct. There are no children of the intervening marriage and there is no evidence whatever as to the effect of this marriage upon the child.

Until Candi was promoted from the third grade, her mother placed her in the St. Paul Child Care Center each day, taking her there when she went to work and picking her up and taking her home for dinner when she left work. Thereafter, because the mother had to go to work early, she would leave

the home before Candi, and Candi would get up and get her own breakfast and go to school, coming home about an hour before her mother did. The maternal grandmother lived about a block and a half away. Now that she has remarried, the mother intends to stay at home and be a housewife so that she can take better care of Candi.

d. *The mother's husband.*

He was a sergeant in the army and at the time of the hearing was stationed at Fort Ord but had been assigned to Fort Riley, Kansas. It was a permanent change of station. He met the mother about six months before they were married and lived near her in San Francisco at that time. This is his second marriage and he was divorced from his previous wife in Mexico. At Fort Riley the army would provide a house on the base and there would be adequate schooling for Candi. He had no relatives at Fort Riley, only friends; and the mother had no relatives or friends at or near Fort Riley.

e. *The father.*

He was employed as a truck driver, a job which he had had only a month and a half. There is no evidence as to his work history or earnings. He had not been in default in his support payments for the child. He stated that he was in training to become general manager of his employer's warehouse and hoped to get that job by the first part of 1960. For several years he did not have a home of his own. He had been remarried and divorced and married again since he was divorced from the mother. He had a child about a year old by his present wife and, as of the date of the hearing, another was expected in February of 1960. He had a two-bedroom home in Burlingame. When Candi came to visit him, she shared a room with the infant. He "would like to purchase a larger home."

Since he remarried the first time it had been understood that Candi would visit the father every other week end instead of every Sunday. This was suggested by the mother so that the father and his new wife would have every other week end free for their social activities.

f. *The father's present wife.*

She stated that she had often seen Candi, had had her in her home for the greater part of two summers and every other week end since she married the father in 1956. She was very fond of Candi and would welcome her in her home. The mother testified that the father's present wife got along well with Candi.

### g. *Other relatives.*

There were relatives on both sides of the child's family living in and around San Francisco. The paternal grandparents lived in San Mateo and a foster brother of the father, who was also married, lived in San Mateo. The maternal grandmother lived in San Francisco, as did three sisters of the mother and their husbands. There was a good relationship between Candi and her mother's relatives. The paternal grandmother had had Candi with her for parts of the foregoing period.

## The Court's Views

At the close of the hearing the court commended the mother for her devotion to the child. It stated that the child has not had much of a home life because of the economic necessities of the mother; it also indicated that the change of residence to Kansas was an unknown quantity; that the new marriage of the mother has not proved itself and introduces another unknown quantity which "may aggravate the situation which, up to this time, has deprived the child of the normal home life. . . ." The court refused to find that the mother is unfit; it said that she is "devoted and dedicated to the child, has done all within her power." The court also indicated that if it were to authorize the child's going to Kansas, she might well be affected adversely and that he thought the child could obtain more stability by remaining in the Bay Area "for at least the next school year." At this point, the present husband of the mother stated "[i]t is possible I can get a transfer here to the area, and I will leave my wife here to visit with her daughter, and I will visit her." To this, the court replied "[t]he case has been submitted. I am going to make my ruling. If circumstances change, the Court is always open to either party."

It is thus apparent that the principal reason for the change of custody was the contemplated move to Kansas and that the court refused to consider the possibility that this move might not have to be made. As we have already indicated, the move was not made, but so far as we know no further application has been made to the court, presumably because of the pendency of this appeal.

## The Legal Problem

A careful examination of the cases leaves us with the feeling that there are no real legal guide lines to assist the appellate court in deciding such a case as this. Guide lines there are, but they are addressed to the trial court in exercising its almost

unlimited discretion, and usually, when one or more of them has been relied upon on appeal, the appellate court has in substance indicated that they are not guide lines upon an appeal. Many of the cases in which an order that either changed or refused to change custody has been reversed involved also an error of the court in refusing to receive material evidence, or in considering incompetent evidence, or some other comparable matter not going to the substance of the question before the court.

It seems to us that the court's refusal to consider the possibility that the mother would not have to take Candi to Kansas was arbitrary. It also seems to us, however, that to reverse the order on this ground would be equally arbitrary because, as we have pointed out, for all we know, the court's order may have worked out well. Any further hearing in the matter would, in the nature of things, have to be a hearing de novo involving an investigation of the present status of the child and the other interested parties, and the decision would have to be based upon the court's conclusions as to the best interests of the child in the light of present circumstances.

1. LEGISLATIVE GUIDE LINES

*a. The best interests of the child.*

■ Civil Code, section 138, directs that the court "is to be guided by the following considerations: (1) By what appears to be for the best interests of the child. . . ."

This is paramount, and so say all the cases. The latest statement by the Supreme Court is in *Sanchez* v. *Sanchez*, 55 Cal.2d 118, 121 [10 Cal.Rptr. 261, 358 P.2d 533]. The court below clearly had this rule in mind.

*b. The child's preference.*

■ Immediately following the language just quoted, Civil Code, section 138, continues: "and if the child is of a sufficient age to form an intelligent preference, the court may consider that preference in determining the question."

The foregoing language is not mandatory. It is at least doubtful if Candi was "of a sufficient age to form an intelligent preference." In any event, it is not a ground for reversal that the court refused even to consider the desires of the child. (*Sanchez* v. *Sanchez, supra*, 55 Cal.2d 118. 124-125; *Gantner* v. *Gantner*, 39 Cal.2d 272. 276 [246 P 2d 923] ; *Kelly* v. *Kelly*, 75 Cal.App.2d 408, 413 414 [171 P.2d 95] ; but compare *Bemis* v. *Bemis*, 89 Cal.App.2d 80, 89 [200 P.2d 84].) In many cases it may be quite unwise to inquire as

to the child's preference; doing so may destroy what little good will is left between the parents or between one of the parents and the child. The court did not abuse its discretion in refusing to consider Candi's preference.

### c. Preference for the mother.

 Civil Code, section 138, provides, in subdivision (2), "but other things being equal, if the child is of tender years, custody should be given to the mother." Who is to say that "other things" are "equal"? The trial court. How is this to be determined? Each case must be determined upon its own facts. (Cf. *Faulkner* v. *Faulkner,* 148 Cal.App.2d 102, 107 [306 P.2d 585]; *Clarke* v. *Clarke,* 35 Cal.2d 259, 261 [217 P.2d 401]; *Bemis* v. *Bemis, supra,* 89 Cal.App.2d 80, 83; *Sorrels* v. *Sorrels,* 105 Cal.App.2d 465, 469 [234 P.2d 103]; *Tapscott* v. *Tapscott,* 149 Cal.App.2d 379 [308 P.2d 399]; *Johnson* v. *Johnson,* 72 Cal.App.2d 721 [165 P.2d 552].)

One court has gone so far as to say: "[W]e have not found in our reported cases a single instance in which the custody of young children has been awarded to their father upon evidence that their mother was a fit and proper person to have their custody and was able to give them advantages equal to those that they would enjoy in the home of the father." (*Bemis* v. *Bemis, supra,* 89 Cal.App.2d 80, 90.) This begs the question. When are "advantages" equal? How does one weigh a better house against a mother's love or, for that matter, San Francisco with the father and relatives against Kansas plus a mother's love? We confess that we do not know; no doubt that is why the books are so full of language about the broad discretion given the trial court. Except in rare cases, the appellate courts abdicate in favor of the trial court's order, because they do not know what else to do. Certainly the facts in *Bemis* are not comparable to those in the case at bar.

In two other cases, the court has used very strong language in regard to the placing of young children with the mother: " 'It is not open to question, and indeed it is universally recognized, that the mother is the natural custodian of her young. This view proceeds on the well known fact that there is no satisfactory substitute for a mother's love. So true is this that in this state the code exacts that she shall have custody of her child, everything else being equal, unless the child has reached the age which necessitates a particular education or preparation for its life work. (Civ. Code, § 138.)

In the case of girls it is obvious that they are particularly in need of the sympathy, affection, consideration and tender care which only a mother can give—and so normally they should be in her custody.' " (*Juri* v. *Juri*, 69 Cal.App.2d 773, 779 [160 P.2d 73], quoting from *Washburn* v. *Washburn,* 49 Cal. App.2d 581 [122 P.2d 96].) In each case, the order was reversed. But in each case the evidentiary support for the order was weaker than in the present case, and the order appealed from was more drastic. In *Juri,* the order deprived the mother of any contact with her children. In *Washburn,* the order was based almost entirely on improperly admitted evidence. See also *Peterson* v. *Peterson,* 64 Cal.App.2d 631, 635 [149 P.2d 206], affirming in reliance on section 138; and compare *Robertson* v. *Robertson,* 72 Cal.App.2d 129, 135 [164 P.2d 52] : contest between mother and strangers.

The only other cases that we have found that reversed an order on the above ground are: *Sorrels* v. *Sorrels, supra,* 105 Cal.App.2d 465, in which there was no question of removing the child to a strange environment, far distant from the father and from her relatives; *Moon* v. *Moon,* 62 Cal.App.2d 185 [144 P.2d 596], in which the real ground of reversal was that the court relied upon improperly admitted evidence; *Ashwell* v. *Ashwell,* 135 Cal.App.2d 211 [286 P.2d 983], where the father had no home for the children.

We cannot say that the court abused its discretion merely because it did not give preference to the mother in this case.

*d. The right of the parent having custody to determine residence.*

Civil Code, section 213, gives a parent entitled to the custody of a child the right to change its residence, but subject to the power of the court to restrain a removal which would prejudice the rights or welfare of the child. There is no doubt that a California court can permit a parent who has custody of a child to remove the child from the state, either to a sister state (*Shea* v. *Shea,* 100 Cal.App.2d 60, 63 [223 P.2d 32]), or to a foreign country (*Gantner* v. *Gantner, supra,* 39 Cal.2d 272, 280).

The courts have indicated some doubts as to the wisdom of permitting one of the parents to remove a child from the state. They fear that the California court may thereby be deprived of any effective means of enforcing its order, partly because the child and the parent will be physically beyond the reach of the California authorities, and partly because a foreign court

may, on the basis of change of circumstances or otherwise, issue a decree that will, for all practical purposes, destroy the California decree. (*Lerner* v. *Superior Court*. 38 Cal.2d 676, 681-682 [242 P.2d 321]; *Smith* v. *Smith*, 126 Cal.App.2d 65, 68-69 [271 P.2d 178].) Yet this view seems to us to attribute to the courts of our sister states a lesser concern for the welfare of children than is displayed by the courts of this state. We doubt that this is a fair or a warranted assumption, and in any event, the question is one of wisdom, not of power or authority.

Is the mother's proposal to take Candi to the mother's new home in Kansas a sufficient basis for the court's order? There are few cases that seem to indicate that it is not. It has been said that "The fact that by the child's removal from the state the father may be deprived of his visitation rights is generally not alone sufficient to justify restraint on the mother's free movement unless the latter is inconsistent with the welfare of the child." (*Dozier* v. *Dozier*, 167 Cal.App. 2d 714, 719 [334 P.2d 957].) An order prohibiting a father, who had custody, from removing the child to his home in Utah, was reversed by this court in *Shea* v. *Shea, supra,* 100 Cal.App.2d 60, 63. However, we also indicated in that case that on remand, the court might, on the basis of the welfare of the child, accomplish the same result by awarding custody to the mother! *Evans* v. *Evans,* 185 Cal.App.2d 566, 571-572 [8 Cal.Rptr. 412], holds that it is an abuse of discretion for a court to discontinue support payments by the father, because the mother, who had custody, had remarried and moved with the child to Utah to live with her new husband.

Most of the cases seem to indicate that a court may transfer custody on the ground that the parent having custody proposed to remove the child from the state, particularly where other factors affecting the welfare of the child point to the same result. It has been said that such a move would effectively end the father's visitation rights. (*Lerner* v. *Superior Court, supra,* 38 Cal.2d 676, 681; *Smith* v. *Smith, supra,* 126 Cal.App.2d 65, 69.) It has been held to be an abuse of discretion to permit removal of a child to Connecticut when the uncontradicted evidence showed that the move would be seriously detrimental to the child's health. (*Dozier* v. *Dozier, supra,* 167 Cal.App.2d 714, 719; and *cf. Smith* v. *Smith, supra,* 126 Cal.App.2d 65, 69.) *Stagliano* v. *Stagliano,* 125 Cal.App. 2d 343 [270 P.2d 91], reversed a change of custody order that would have transferred the child's residence to Mas-

sachusetts. In *Ashwell* v. *Ashwell,* 135 Cal.App.2d 211, 217-218 [286 P.2d 983], one of the reasons for reversing a decree transferring custody to the father was that he intended to take the children to Virginia, to live with his mother. And in *Johnson* v. *Johnson, supra,* 72 Cal.App.2d 721, an order transferring custody to the mother was reversed apparently in part because its effect would be the removal of the child to Nevada.

In the case before us there were additional factors—namely, that Candi would be among strangers, removed from contact with the relatives of both her father and mother, who had had much to do with her upbringing, again transferred to a different school, and living with a new stepfather, with whom she had been associated for only a short time, and whose marriage to her mother was of at least doubtful validity.

2. GUIDE LINES IN THE CASE LAW

*a. The presumption in favor of the action of the trial court.*

It has been so frequently stated as to have become a truism that primary consideration must be given to the welfare of the child, that the court is given a wide discretion, that its discretion will not be disturbed in the absence of a manifest showing of abuse, and that every presumption supports the reasonableness of the decree. (*Sanchez* v. *Sanchez, supra,* 55 Cal.2d 118, 121-122; *Gudelj* v. *Gudelj,* 41 Cal.2d 202, 208-209 [259 P.2d 656]; *Gantner* v. *Gantner, supra,* 39 Cal. 2d 272, 275; *Clarke* v. *Clarke, supra,* 35 Cal.2d 259, 261; *Foster* v. *Foster,* 8 Cal.2d 719, 730 [68 P.2d 719]; *Peterson* v. *Peterson, supra,* 64 Cal.App.2d 631, 636; *Kelly* v. *Kelly, supra,* 75 Cal.App.2d 408; *Frizzell* v. *Frizzell,* 158 Cal.App. 2d 652, 655 [323 P.2d 188].)

We find no authority distinguishing between insufficient evidence and abuse of discretion. It would seem obvious that, if there were *no* evidence to support the decision, there would be an abuse of discretion. But we do not think that it follows that there can be no abuse of discretion if there be any evidence to support the decision. It is certainly true that there could be a case where the decision is obviously not for the best interests of the child, even though there is some evidence to support it. We think that a number of the cases cited in this opinion, in which an order was reversed, fall into this category. Yet the latest decision of the Supreme Court in *Sanchez* v. *Sanchez, supra,* 55 Cal.2d 118, 126, seems to equate abuse of discretion with lack of evidence.

However that may be, we cannot find either a lack of sufficient evidence or a clear abuse of discretion in this case.

*b. The change of circumstance rule.*

This "rule" has been variously stated. It is said that the party seeking a change of custody has the burden of proving that circumstances or conditions have changed so as to justify his request for a modification. (*Stagliano* v. *Stagliano, supra,* 125 Cal.App.2d 343, 348.) Yet the court limited the burden to a showing that a modification "would not be detrimental to her [the child's] welfare." It is said to be "well established that 'the courts are reluctant to order a change of custody and will not do so except for imperative reasons.' " (*Sorrels* v. *Sorrels, supra,* 105 Cal.App.2d 465, 469.) It is often said that "there should be an end to the constant changes and modifications of orders having to do with the custody of a child." (*Saltonstall* v. *Saltonstall,* 148 Cal.App.2d 109, 114 [306 P.2d 492].)

The "change of circumstances" rule is judge made. Its purpose is to protect the court, the parties and the child from interminable and vexatious litigation. (*Cf. Gantner* v. *Gantner, supra,* 39 Cal.2d 272, 276; *Peterson* v. *Peterson, supra,* 64 Cal.App.2d 631, 633; *Washburn* v. *Washburn, supra,* 49 Cal.App.2d 581, 587 [122 P.2d 96] ; *Olson* v. *Olson,* 95 Cal. App. 594 [272 P. 1113] ; *Foster* v. *Foster, supra,* 8 Cal.2d 719, 726.)

In several cases the courts have relied upon the rule to reverse. (*Cf. Bemis* v. *Bemis, supra,* 89 Cal.App.2d 80; *Smith* v. *Smith, supra,* 126 Cal.App.2d 65; *Sorrels* v. *Sorrels, supra,* 105 Cal.App.2d 465, 469; *Stagliano* v. *Stagliano, supra,* 125 Cal.App.2d 343; *Moon* v. *Moon, supra,* 62 Cal.App.2d 185; *Juri* v. *Juri, supra,* 69 Cal.App.2d 773.) But most cases say that the rule is not inflexible. (*Bemis* v. *Bemis, supra,* 89 Cal.App.2d 80, 91; *Exley* v. *Exley,* 101 Cal.App.2d 831 [226 P.2d 662] ; *Peterson* v. *Peterson, supra,* 64 Cal.App.2d 631; *Kelly* v. *Kelly, supra,* 75 Cal.App.2d 408, 410; *Foster* v. *Foster, supra,* 8 Cal.2d 719, 728; *Ashwell* v. *Ashwell, supra,* 135 Cal.App.2d 211; *Johnson* v. *Johnson, supra,* 72 Cal.App. 2d 721.)

In *Frizzell* v. *Frizzell, supra,* 158 Cal.App.2d 652, 655, this court speaking through Peters, Presiding Justice, went so far as to say that the changed circumstances rule "has no application where the trial court has modified a decree. That rule only applies where the trial court has refused to modify

a decree and it is contended an abuse of discretion occurred. To show such an abuse there must be a showing of changed circumstances.'' (P. 655.) To the writer, this reasoning is directly contrary to many decisions and to the reason for the rule, and will encourage repeated applications to the court, and repeated changes in custody, to the detriment both of the administration of justice and of the child and its parents. *Kelly* v. *Kelly, supra,* 75 Cal.App.2d 408, and *Dotsch* v. *Grimes,* 75 Cal.App.2d 418 [171 P.2d 506], cited by the court, do not support the conclusion stated. Those cases only hold that the rule is not paramount to the more important consideration, the welfare and best interest of the child.

The only ''rule'' consistently applied is that the court may modify or vacate its order ''at any time.'' (Civ. Code, § 138; *cf. Exley* v. *Exley, supra,* 101 Cal.App.2d 835.)

The mother's principal reliance is upon the change of circumstances ''rule.'' As we have seen, it is no longer a rule, if it ever was one. Moreover, here there were changed circumstances—the remarriage of both parties, the contemplated move to Kansas, and other factors as well.

*c. The care given the child.*

No authority need be cited for the proposition that the court can consider the care given the child by the parties. In this case, however, the court did not base its order on any lack of care for the child by the mother. The showing made would not justify a change of custody on that ground.

''The fact that a divorced working mother is impelled by circumstances to relinquish the physical care of her child when boarding him, is not, in itself, indicative of a relinquishment of her power and duty of supervision over the child.'' (*Sorrels* v. *Sorrels, supra,* 105 Cal.App.2d 465, 473—a case, in this regard, similar to the case at bar; and see *Ashwell* v. *Ashwell, supra,* 135 Cal.App.2d 211; *Robertson* v. *Robertson, supra,* 72 Cal.App.2d 136-137.)

In *Ashwell, supra,* where a decree transferring custody of four young children from the mother to the father was reversed, the court said: ''The meager showing, disputed by the neighboring women, that there was anything amiss in Norma's care of her children can be dismissed as of no moment. Any normal, healthy, playing child of the ages of these children will at some time during almost every day be found to need a bath and there was no attempt here to show that

in proper time these children did not get the needed ablution. Curtis said, additionally, that he found the children raggedly dressed, but he did not otherwise describe their clothes, and these children, described by the neighbors as healthy, happy, active children, probably were at times dressed in clothes that had been torn and needed mending. These things really do not measure up even to makeweights as against the imperative need of very young children for the constant care and love of the only person who can fill these needs in full measure—the mother who bore them. There is no worthwhile dispute here but that Norma took good care of her children, and if she did that then anyone who has observed the tasks that must be performed by a mother in caring for four tiny children will know that she is the hardworking, and, toward her children, the conscientious woman that her neighbors testified she was.'' (P. 216.)

d. *The fitness of the parents.*

 Here the court expressly refused to find that the mother was not a fit custodian of Candi. Its opinion obviously was that she is fit. There is no requirement that the court find that a parent is unfit before it can award the child to the other parent. (*Faulkner* v. *Faulkner, supra,* 148 Cal. App.2d 102, 107; *Bemis* v. *Bemis, supra,* 89 Cal.App.2d 80, 91; *Exley* v. *Exley, supra,* 101 Cal.App.2d 831, 835; *Tapscott* v. *Tapscott, supra,* 149 Cal.App.2d 379, 382; *Frizzell* v. *Frizzell, supra,* 158 Cal.App.2d 652, 655; *contra*: *Johnson* v. *Johnson, supra,* 72 Cal.App.2d 721, 724.)

 The courts have frequently warned that a judge should not base his decision upon his disapproval of the morals or other personal characteristics of a parent that do not harm the child. It is not his function to punish a parent by taking away a child. (*Clarke* v. *Clarke, supra,* 35 Cal.2d 259, 261-262; *Sorrels* v. *Sorrels, supra,* 105 Cal.App.2d 465, 471; *Ashwell* v. *Ashwell, supra,* 135 Cal.App.2d 211, 217; *Washburn* v. *Washburn, supra,* 49 Cal.App.2d 581, 587-588.)

On the other hand, if the court determines that a parent is not a fit custodian, and if there is evidence to support the finding, it is obvious that the child should not be left in such a parent's custody. For that reason, in nearly every case, one of the things considered in deciding what is for the welfare of the child is the personal behavior and characteristics of the parent. (E.g., *Clarke* v. *Clarke, supra,* 35 Cal.2d 259; *Johnson* v. *Johnson, supra,* 72 Cal.App.2d 721.)

Here, however, nothing was brought out that would support the order on grounds of lack of fitness of the mother.

*e. The stability of the new marriage.*

▮ It has recently been held that a court did not abuse its discretion in basing its order transferring custody from the mother in part on its belief that her recent marriage " 'has not yet proved itself.' " (*Sanchez* v. *Sanchez, supra,* 55 Cal.2d 118, 124.) We cannot help feeling, in the light of this ruling, that the only safe course for a divorced mother who wishes to keep the custody of her young child is not to remarry, even though the marriage might enable her, for the first time in the child's life, to provide a real home for the child.

Here, however, there was an additional factor—the possible invalidity of her marriage, which the court could consider along with other matters. In *Johnson* v. *Johnson, supra,* 72 Cal.App.2d 721, where the wife had first submitted to the jurisdiction of the California court, and then obtained a Nevada decree of divorce and remarried, the court held that the uncertainty as to the validity of her second marriage could be considered, and reversed an order transferring custody of a child to her.

Were it not for some such factor, indicative of instability, we would feel that the mother's remarriage is no proper basis for depriving her of custody. In *Juri* v. *Juri, supra,* 69 Cal.App.2d 773, 776, the court held that the only change of circumstances was that the mother had remarried and was living in a home of her own with her husband and his two children—"a change for the better," and reversed an order awarding sole custody to the father. In *Kelly* v. *Kelly, supra,* 75 Cal.App.2d 408, an order transferring the child to the mother was upheld, largely because she had remarried and could provide the child a home.

### Conclusion

▮ We suggest that the foregoing opinion demonstrates that some authority can be found on both sides of nearly any contention that can be made as to reasons for changing or not changing the custody of a child. However, the force of a case as a precedent depends very greatly on whether it reversed or affirmed the order appealed from, in view of the very strong presumption in favor of the order of the court below. It is apparent to us that over the years the appellate courts have almost completely abdicated in this field in favor

of the trial courts. This may well be the only practicable course, particularly because of the length of time between the making of an order and the decision on appeal. The appeal no longer stays the court's order (Code Civ. Proc., § 949a), so that one reason for taking an appeal is gone. By the same token, the fact that the order is not stayed is in itself a further argument against reversal. Under these circumstances, it can be predicted that reversals will be rare indeed. Perhaps the time is ripe for a reappraisal of the judicial process in this field, and the development of new and better techniques than we now have. (See 13 Stan. L.Rev. 108, esp. pp. 116-122.)

Affirmed.

Bray, P. J., and Tobriner, J., concurred.