[Civ. No. 24670. Second Dist., Div. One. Nov. 28, 1960.]

HELEN A. HARRIS, Appellant, v. E. KENNETH HARRIS, Respondent.

Daniel G. Marshall for Appellant.

Paul Caruso for Respondent.

LILLIE, J.—Appellant sued for divorce in Marin County in 1956; subsequently the parties executed a property settlement agreement providing in part that they shall have joint legal custody of the five minor children, with their physical care in the mother and right of reasonable visitation in the father, and that he shall pay to her for their support $120 each, or a total of $600 per month; and the foregoing was incorporated in the interlocutory decree of December 13, 1956. Thereafter in April 1957, and under court order, appellant moved the children to Los Angeles. A final decree of divorce was entered in December 1958. On May 29, 1959, respondent filed an order to show cause for modification of the interlocutory decree seeking physical custody of the minors; for a change of circumstances he alleged that appellant did not apply the $600 per month to the care and support of the children, that she was taken into custody by juvenile authorities because of unsanitary conditions under which the minors were kept, that the health and welfare of the children are in jeopardy, and that the children do not have adequate clothing and food. After a five-day hearing during which extensive testimony was taken, the lower court entered an order changing custody to respondent father subject to appellant's reasonable visitation. She appeals from the order.

Recognizing general rules relating to modification of custody orders and that each case must be decided on its own merits, appellant claims an abuse of the lower court's discretion in that the change of circumstances was not sufficient to deprive five small children of the care of their mother or to make their transfer to the custody of their father essential or expedient for their welfare and best interests. She also

claims error in the admission of certain evidence which, she argues, was outside the issues, and in the lower court's refusal to appoint an investigator under section 263, Code of Civil Procedure.

Inasmuch as the original order was based upon an agreement of the parties, no evidence was offered at the divorce hearing relative to custody and no finding was made concerning the fitness of the respective parties. ██ In granting modification, although finding respondent to be a fit and proper person, the lower court made none concerning the unfitness of appellant, basing the order on a series of findings relative to conditions directly adversely affecting the children and existing since their removal to Los Angeles in 1957 (Findings of Fact, pp. 1-9), and on a finding that "[F]or the best interest and welfare of the children, custody should be with defendant" (Findings of Fact, p. 9). No showing or finding of unfitness was necessary to enable the court to make such an award. (*Holsinger* v. *Holsinger*, 44 Cal.2d 132 [279 P.2d 961]; *Davis* v. *Davis*, 41 Cal.2d 563 [261 P.2d 729]; *Munson* v. *Munson*, 27 Cal.2d 659 [166 P.2d 268].)

██ Matters of custody and care of a minor child under section 138, Civil Code, are addressed to the sound discretion of the trial court. (*Goto* v. *Goto*, 52 Cal.2d 118 [338 P.2d 450]; *Holsinger* v. *Holsinger*, 44 Cal.2d 132 [279 P.2d 961]; *Gantner* v. *Gantner*, 39 Cal.2d 272 [246 P.2d 923]; *Clarke* v. *Clarke*, 35 Cal.2d 259 [217 P.2d 401]; *Prouty* v. *Prouty*, 16 Cal.2d 190 [105 P.2d 295].) ██ This discretion is broad, to be exercised with a view toward the highest and best interests of the minor (*Gantner* v. *Gantner*, 39 Cal.2d 272 [246 P.2d 923]; *Davis* v. *Davis*, 41 Cal.2d 563 [261 P.2d 729]), and unless a clear case of abuse is made to appear a reviewing court will not reject the lower court's determination and substitute its own opinion therefor.

Section 138, provides in part that the court shall be guided by the following considerations: "(1) . . . what appears to be for the best interests of the child . . . (2) As between parents adversely claiming the custody, neither parent is entitled to it as a right; but other things being equal, if the child is of tender years, custody should be given to the mother; if the child is of an age to require education and preparation for labor or business, then custody should be given to the father." ██ "In the application of this statutory provision the court has a wide discretion and in determining whether other things are equal the primary con-

sideration is what will promote the best interests of the child.'' (*Goto* v. *Goto,* 52 Cal.2d 118, 123 [338 P.2d 450], quoting from *Fine* v. *Denny,* 111 Cal.App.2d 402, 403 [244 P.2d 983].)

Appellant's contention that the evidence lacks a showing of a change of circumstances warranting modification is entirely without merit, for the record is replete with evidence to the contrary showing not only that a substantial change in living conditions took place since the children came to Los Angeles, but that it was a drastic change actually endangering their health and welfare. Moreover, under the present factual showing we doubt the strict applicability of the rule requiring a showing of change in conditions as set forth in *Holsinger* v. *Holsinger,* 44 Cal.2d 132 [279 P.2d 961] and *Davis* v. *Davis,* 41 Cal.2d 563 [261 P.2d 729]. Even were the evidence insufficient to support the alleged change, we would be inclined to consider this situation an exception to the so-called ''changed circumstance'' rule, warranting adherence to the view taken in *Goto* v. *Goto,* 52 Cal.2d 118, 123 [338 P.2d 450], that it is not an ''iron-clad'' rule but subject to exception where despite the fact no change of circumstances is apparent, the welfare of the child might require the previous order of custody be changed. (*Foster* v. *Foster,* 8 Cal.2d 719 [68 P.2d 719].) ■ Following the trend, first suggested in the Foster case, *supra,* 8 Cal.2d 719, courts have been liberal in the application of the ''change of circumstance'' rule; it has not been applied where it can be assumed both parents were found fit (*Kelly* v. *Kelly,* 75 Cal.App.2d 408 [171 P.2d 95]); nor where the trial court has modified the custody decree. (*Frizzell* v. *Frizzell,* 158 Cal.App.2d 652 [323 P.2d 188].)

■ Said the court in the Frizzell case, *supra,* at page 655; ''That rule only applies where the trial court has refused to modify a decree and it is contended an abuse of discretion occurred. To show such abuse there must be a showing of changed circumstances. (*Kelly* v. *Kelly,* 75 Cal.App.2d 408 [171 P.2d 95]; *Dotsch* v. *Grimes,* 75 Cal.App.2d 418 [171 P.2d 506].)''

■ The burden of proving an abuse of the lower court's discretion falls on appellant (*Horsley* v. *Horsley,* 77 Cal.App. 2d 442 [175 P.2d 580]) and in the absence of such a showing an appellate court will not disturb the trial court's determination; its discretion in determining the best interests of a minor will be upheld unless the record is barren of substantial evidence to support it. (*Noon* v. *Noon,* 84 Cal.App.2d 374 [191 P.2d 35]; *Ducharme* v. *Ducharme,* 152 Cal.App.2d 189

[313 P.2d 33]; *Horsley* v. *Horsley*, 77 Cal.App.2d 442 [175 P.2d 580].) Viewing the evidence and all reasonable inferences therefrom in the light most favorable to the order of the court below (*Ducharme* v. *Ducharme*, 152 Cal.App.2d 189 [313 P.2d 33]; *Frizzell* v. *Frizzell*, 158 Cal.App.2d 652 [323 P.2d 188]; *Holsinger* v. *Holsinger*, 44 Cal.2d 132 [279 P.2d 961]), we conclude appellant has failed in her burden; and the record before us discloses no abuse of judicial discretion in the trial court's determination that the best interests and welfare of the children will best be served by permitting their father to care for them.

In support of appellant's argument that the children need the care of their mother, she submits in detail certain partisan evidence interspersed with arguments in justification of her conduct, but in doing so she neglects the time-honored rule that the weight of evidence, credibility of the witnesses and the resolution of factual conflicts are matters primarily for the trial court. Although the matter was bitterly contested, whether bias of certain witnesses existed and what if any effect it had on their credibility and the weight to be given the evidence were matters for the determination of the lower court. The trial, five days long, produced approximately 600 pages of testimony, some 26 exhibits, 24 witnesses, and the five children. The judge heard the witnesses speak and observed their appearance, conduct and manner of testifying; saw the children ranging from 3 to 9 years; and listened to a sorrowful account of maternal indifference to, irresponsibility for and neglect of five small children.

 The parties were married in 1949; they have three boys and two girls—Kathy (1950), Charles (1952), Christopher (1953), Courtney (1954) and Collin (1956). The property settlement agreement gave appellant $50,000 as her share of the community property, an interest in joint tenancy realty, household furniture, and $600 per month for child support (which respondent has paid regularly). In April 1957, appellant moved the children to Southern California. Respondent is a doctor of medicine, practicing in San Francisco and Beverly Hills.

The evidence of appellant's conduct in relation to the children is extensive, cumulative and somewhat burdensome as to preclude factual review in any detail.

The first finding, that appellant refused to permit the children to acknowledge respondent as their father, is supported by lengthy evidence of a deliberate attempt to reduce

respondent's parental status with his children to that of a stranger, and to eliminate him from their lives except as someone who "comes around and makes trouble." The children call respondent "Kenneth"; "time and time again" they informed him he was not their father and their real father died in the war, when respondent corrected them they told him they couldn't call him "daddy" because their mother would spank them; Charles told respondent: "You are not my daddy. You are just a man who comes around and makes trouble for us"; and at other times Charles said his mother would spank him if he talked with him or called him "daddy." Mr. Spiegel, once married to appellant, "seldom" heard the children refer to respondent and then only as "Kenneth." Mrs. Scott, former housekeeper, heard appellant tell the children that Dr. Lynn, her current boy friend, was their father and "Kenny was a man just to bring them toys"; and when their father came to the house the children called him "Kenny"; when she tried to correct them they told her, "No, that is not my father. My father is dead because my mother said it. Dr. Lynn is our father"; and appellant instructed her never to teach the children respondent is their father. Mrs. Hall, a baby sitter, heard appellant repeatedly tell the children that Dr. Lynn was their father, and "bawled her out" because she told the oldest girl who respondent was. Mrs. Rogers, another baby sitter, testified that Kathy asked about her father and said her mother had told her respondent was not her father; and that she told Kathy that he was.

The second finding, that appellant through her actions and conversations with the children attempted to make them dislike and turn away from respondent, is supported by ample evidence of conduct designed to make the children disrespectful to and distrustful and afraid of their father. Appellant made respondent's visitations difficult—often refusing on "some excuse" to permit him to see them, not having them ready, and always requiring them to meet him at the back door; threatened to and did spank them if they spoke to him outside of the house (as a result the children refused to speak, ran away, ignored his presence, and pulled down the shades so that he could not see them); and told them respondent "makes trouble for them" and she would spank them if there was any more trouble. In May 1958, respondent visited the two children at school; appellant drove up and in front of the teachers started a verbal and physical

altercation with him, throwing the children's lunch pails at him and among other things saying, "They are your Jew children and they are no good." A few days before Kathy's birthday respondent gave her a dress; five minutes later appellant snatched it from her, threw it into the fire and burned it "because it came from him" (testimony of respondent, appellant and housekeeper). Appellant engaged in bitter quarrels and altercations with respondent and called him names in front of the children; once while taking movies of the children appellant called him foul names, threatened to kill him if he ever again attempted to take their pictures, struck him and broke the camera (photos thereof taken just prior to the breaking of the camera were shown to the trial judge).

The court further found that plaintiff maintained residences while in Southern California in a condition unsuitable for occupancy of minor children (p. 3, Findings of Fact). The supporting evidence is reviewed in the light of the $600 per month paid to appellant for child support and the $50,000 settlement. Appellant moved to Braeridge Drive in April, 1957, and resided there until May 1958. Mrs. Hall, who took care of the children, found the house "terrible" and "filthy," and the toilet stopped up. Mrs. Murphy, a policewoman, went to the premises in response to a call that the children were left alone, and saw it almost bare of furniture (the dining room had no furniture and the baby slept there on the floor). There were no wash cloths in the house, only "a few things to do with"; juvenile officers found a big pile of broken glass in the middle of the playroom floor covered with a polo coat. Mrs. Rogers found the condition of the house "very bad," the sink full of dirty dishes, so much food and dirt on the floor she could hardly walk, a "messed up" table, garbage under the sink ("so bad" and "smelly") and a garage "rotten" and full of flies; she many times wanted to call the "health authorities."

In June 1958, appellant moved to Woodbridge Avenue and two months later to Valley Heart Drive, where she lived until the order to show cause was served upon her (June 1959). The house was small, had only two bedrooms (4 x 8; 6 x 8), front room, kitchen and service porch; and although originally rented to appellant in good condition, soon the children were living under the following conditions: The toilet was stopped up and the children used the space for the utility box outside under the neighbor's kitchen window

for a toilet; four or five windows were broken, the screens and frames and the screen door were torn to pieces; the sink was stopped up and the kitchen floor was flooded; there was no bathtub, only a shower, and the bathroom sink was not working; the only cooking facility consisted of a hot plate; and for six or seven weeks there was no electricity in the house, only candles. A neighbor testified the house was "very, very filthy," the floor was dirty and there was a very bad "bathroom" odor; another neighbor said "it was the filthiest home" she had ever seen, the walls, floor and furniture were spattered with soured chocolate milk, bread was soaked in it, human and animal defecation was on the floor covered with a towel, paper or rag, a dirty mattress was on the floor over which everyone walked, there was a dirty little crib, a hot plate and no stove or telephone. Mr. Alexander, a county deputy marshal, testified the house was in a "very filthy" condition—two or three days before, liquid had been spilled on the floor; empty food cans were around the kitchen; sour milk was spilled all over; the refrigerator door was open; there was no electricity in the house; the toilet was stopped up, defecation and dirty water had gone over the bowl onto the bathroom floor; the washbasin was stopped up and the water level was up to the top; the sheets were almost black with dirt and filth; and the odor was "awful." Mr. Wolfe, a private investigator, found no rugs on the floor, one wooden table, an old couch and a dirty mattress on the floor, no linens, three or four squashed milk cartons, a banana peel and dry food stains on the floor; and the odor was "very bad. I had to hold my nose the odor came out of the house so strong." Appellant in her testimony admitted she had no workable stove, cooked only on a hot plate; for a month or so there was no electricity because "obviously" she had not paid the bill and had to use candles; and the toilet was stopped up but could be flushed by using a bucket.

The fourth finding, that appellant frequently failed and neglected to provide adequate food for the children, is supported by evidence that they were generally hungry and seldom had much food in the house, somtimes none. A series of domestic helpers testified that the children neither had enough nor the proper kind of food. Mrs. Scott said that at times there were only eggs in the house sometimes hot cakes and milk, but no meat ("meat not very often"), sometimes fruit; that the children were tired of their diet and complained; that on at least four occasions there was no food in

the house and she went out and bought hamburger, cantaloupe and cornmeal with her own money, for which she was never reimbursed; that she told appellant there was not enough food and that the children ought to have more to eat; that at one time they cooked no food for two weeks (drank milk and ate rolls and doughnuts), and then for five months cooked only on a hot plate. Mrs. Rogers testified the children "had very little food ever"; that for dinner she had to give them oatmeal; and that on occasions she had to bring food from home for which she was never reimbursed. Mr. Hurst whom appellant called in for an estimate on house repairs felt sorry for the children and took food to them, which he paid for. Mr. Alexander, deputy marshal, in February 1959, went to the premises and found a hungry child and only corn-flakes and sour milk to eat. Mrs. Murphy, policewoman, found the refrigerator empty except for one half bottle of milk, one package of hamburger and one bottle of champagne, and one dozen packages of cookies on the sink. Respondent saw the kitchen sink stacked with at least 50 dirty dishes, a turkey on the sink and a cat eating off of the turkey on the top of the sink; and in the refrigerator some wilted celery and lettuce, a liquor bottle, two cartons of milk and some kind of pudding; in 1958 he observed the children in school; they had thermos bottles caked inside with dried milk filled with pineapple juice and a sandwich each, and they asked the other children for food.

The trial court also found that appellant frequently left home leaving the children at home unattended (p. 5, Findings of Fact). Mrs. Abouchahla, a neighbor, several times observed the children alone; on various occasions she saw them out at night alone until 9 o'clock; about three weeks before the trial, observed the children unattended, and Courtney, then 3, run down the street where "some man had picked her up in the car that stopped in front of our house." Another neighbor saw the smallest child in front of her house at 10:30 at night, and quite often Chuck and Chris would come to her and wait until midnight for appellant to return. When respondent brought the four older children back from Disneyland he found the baby alone in the house in his crib, covered with a torn screen; another time appellant left the children alone all night with Kathy in charge and in the morning at 8:25 respondent observed appellant and Dr. Lynn coming out of a motel (Mr. Young, an employee of the motel, corroborated respondent's testimony that appellant and a

man registered there at that time); and on another occasion he found the baby, then 2 years old, alone in the house and when he remonstrated with her she told him that it was none of his business and that the children were nothing but little Jew children and "will never amount to anything because you are their father."

The last finding in this series is that on April 13, 1957, appellant was admitted to the hospital for taking an overdose of barbiturates and on another occasion indicated she wanted to take her life (p. 6, Findings of Fact). Appellant admitted that on April 13, 1957, she was taken to Cedars of Lebanon Hospital for taking an overdose of barbiturates. Mr. Hurst, a tradesman, said that appellant was very despondent and told him "she wanted to go out and kill herself."

The seventh and eighth findings of fact, that respondent is a fit and proper person to have custody of the children, and that he can properly provide for their support and maintenance—are supported by evidence that respondent is a professional man and a practicing doctor with an adjusted gross income of in excess of $68,000; he has a $59,000 five-bedroom furnished house in a fine neighborhood for children, near schools, a staff of a housekeeper, nurse and other help to care for their needs and he desires to make up the children's school deficiencies and give them proper religious training. He will live with the children, likes his home and stays there evenings.

The last finding, that it is for the best interest and welfare of the children that custody be with respondent (p. 9, Findings of Fact) is supported not only by the foregoing, but by other extensive testimony of neighbors, law enforcement officers, a private investigator, domestic helpers, respondent and appellant, showing appellant's drinking and sleeping pill episodes, her use of profane language in and out of the presence of the children, lying nude around the house on the floor and in their presence, scanty dress, yet extravagant expenditures for her own clothing while there was inadequate food in the house, and general lack of care of her children by appellant. In connection with the latter, the evidence shows "lots of times" in the winter the children were outdoors dressed in bathing suits—sometimes in the rain; they seldom wore panties, the baby never; their bodies were filthy and their faces were caked with dried food and refuse; their clothing was very dirty, the children were often barefoot and when they did wear shoes they did not match

or were on the wrong feet; the little one was "always" "running around without clothes"; the children were on occasions out late at night (after 10:30) and ill-clad; they were often only half-dressed and what clothing they wore was ragged, torn and ill-fitting; they were sometimes late for school when they "did not have anything to put on"; there was a bad odor about them and their faces were pale. As to their health, at one time their mouths and faces were covered with sores to which no medical attention was given; and Charles has developed a vicious type of personality, antagonistic to correction and authority, and does not mix with the other children. Appellant admitted to Mrs. Murphy the policewoman "that the children were a little too much for her."

It was entirely proper for the lower court in revising and modifying its decree to consider, besides the obvious conditions of the household, the family relations, financial conditions of the parents and the ages of the children (*Crater* v. *Crater*, 135 Cal. 633 [67 P. 1049]), the whole background of the children and their parents (*Foster* v. *Foster*, 8 Cal.2d 719 [68 P.2d 719]) and any other factors which have a bearing on the welfare of the children such as—the mother's lack of interest in them (*Frazier* v. *Frazier*, 115 Cal.App. 2d 551 [252 P.2d 693]) and her lack of devotion and concern for their welfare (*Davis* v. *Davis*, 41 Cal.2d 563 [261 P.2d 729]); neglect of, insufficient facilities and inability to care for, the children (*Hamilton* v. *Hamilton*, 104 Cal.App.2d 111 [231 P.2d 69]); hostility of the mother toward the father and her refusal to allow him to express an interest in them (*Holsinger* v. *Holsinger*, 44 Cal.2d 132 [279 P.2d 961]) and her incapability of exercising necessary discipline, supervision and control over the children and her deliberate estrangement of them from their father (*Goto* v. *Goto*, 52 Cal.2d 118 [338 P.2d 450]); the home atmosphere (*Prouty* v. *Prouty*, 16 Cal.2d 190 [105 P.2d 295]) and the available superior care and home of one parent (*Smith* v. *Smith*, 135 Cal.App.2d 100 [286 P.2d 1009]); and the educational needs of the children (*Disney* v. *Disney*, 121 Cal. App.2d 602 [263 P.2d 865]).

In view of the foregoing we deem further discussion concerning the sufficiency of the evidence to support a change of circumstances and the finding that it is for the best interest and welfare of the children that they be given to their father, unnecessary. The trial court awarding custody to respondent gave appellant, besides reasonable visitation

at the home of respondent, the right to physical possession for one month during the summer vacation, respondent to deliver and return them and pay to her $500 for their support; in addition it ordered respondent to pay appellant $100 three times a year (August, December and April) for the purpose of traveling to San Francisco to visit the children, and while in San Francisco she has permission to take the children from their home for six-hour visitations.

Appellant complains that the lower court erred in admitting evidence which she contends was outside the issues tendered in the order to show cause. In connection with respondent's testimony that on one occasion he found the children alone and unattended at appellant's house at night, and that at midnight he called his daughter Kathy to see when appellant would return—to corroborate his statement that appellant had left the children alone all night—he further testified that earlier in the evening he had seen Dr. Lynn's car parked at the Beverly Terrace Motel, that when Kathy told him her mother would be gone all night he returned to the motel and waited until 8:25 the next morning when he observed Dr. Lynn and appellant come out of the motel. When this evidence was received no objection was interposed, nor did appellant later make any motion to strike it. *Several days later* in the trial a Mr. Young, employed by the Beverly Terrace Motel, corroborated respondent's story by testifying that appellant on that night entered the motel with a male companion, registered and was given a key. For the first time an objection was made to this evidence—on rebuttal several days after respondent had testified to the motel visit and appellant had denied it.

Appellant's contention that her moral conduct was outside of the issues cannot be sustained under the almost unlimited discretion the trial court has in considering the whole background of the child which includes "the financial conditions of the parents, their interests, their morals, and their dispositions, as well as any other factor which might aid the court in determining the probability of either parent furnishing a happy harmonious home for the child" (*Foster* v. *Foster*, 8 Cal.2d 719 [68 P.2d 719]), and the conduct of the parties. (*Holsinger* v. *Holsinger*, 44 Cal.2d 132 [279 P.2d 961].) In any event, the evidence was not offered in relation to her moral conduct but in connection with appellant's neglect in leaving the children alone all night.

Any suggestion that appellant had no notice that her moral

character would be questioned and that she was without time to prepare to defend same, is clearly without merit. The allegations that the health and welfare of the children are in jeopardy by appellant's wilful failure to provide a clean and safe dwelling and that respondent is better able to provide a safe and wholesome residence for them, contained in the order to show cause must have put her on notice that anything material to the welfare of the children would be placed before the court; further, the testimony relative to the motel episode was offered the second day of trial and it was not until four days later Mr. Young was called on rebuttal, giving appellant four days' notice in which to prepare to meet the charge.

It is obvious, as in the case of *Cornwall* v. *Cornwall*, 108 Cal.App.2d 95 [238 P.2d 8], that "both sides treated the hearing as taking in and embracing the whole field of controversy" (p. 110), and even if it could be said that the inquiry went beyond the issues tendered by the moving party, in the absence of timely objection we find no merit in such a point.

Finally appellant complains that the trial court's failure to appoint an investigator was prejudicial error in that section 263, Code of Civil Procedure, makes such appointment mandatory, thus jurisdictional. The very language of section 263 defeats such a contention. The section obviously directs the duties of investigators who may be appointed to assist the superior court, but nothing therein requires the court to make any such appointment in the first instance. However, if an investigator is appointed, the statute then makes it mandatory that he report the results of his investigation to the trial court and be available for cross-examination. We know of no decision that requires the appointment of an investigator in a domestic relations case under section 263. And in view of the lengthy trial and extensive testimony we find no abuse of the lower court's discretion in denying the request for an appointment of an investigator.

For the foregoing reasons the order is affirmed.

Wood, P. J., and Fourt, J., concurred.