[Civ. No. 53491. First Dist., Div. Three. Mar. 13, 1985.]

In re JACQUELINE G., a Minor.
DEPARTMENT OF SOCIAL SERVICES OF THE CITY AND
COUNTY OF SAN FRANCISCO, Petitioner and Respondent, v.
JACQUELINE G. et al., Objectors and Appellants.

## COUNSEL

Linda F. Robertson, Richard A. Lieberman and Berman & Glenn for Objectors and Appellants.

George Agnost, City Attorney, and Thomas J. Owen, Deputy City Attorney, for Petitioner and Respondent.

## OPINION

BARRY-DEAL, J.—Jacqueline G., a minor, and her natural father, Manuel G., each appeal from the judgment entered on July 3, 1981, declaring the minor free from the father's custody and control pursuant to the provisions of Civil Code section 232, subdivision (a)(7),[1] and referring the minor to the Department of Social Services of the City and County of San Francisco (DSS) for adoption. The child's natural mother, who relinquished the minor for adoption in February 1980, is not a party to this appeal.

---

[1] At the time of the hearing in 1981, Civil Code section 232 provided, in relevant part: "(a) An action may be brought for the purpose of having any person under the age of 18 years declared free from the custody and control of either or both of his [or her] parents when such person comes within any of the following descriptions:

". . . . . . . . . . . . . . . . . . . . . . .

"(7) Who has been cared for in one or more foster homes, . . . under the supervision of the juvenile court, . . . for two or more consecutive years, providing that the court finds by clear and convincing evidence that return of the child to his [or her] parent or parents would be detrimental to the child and that the parent or parents have failed during such period, and are likely to fail in the future, to do the following:

"(i) Provide a home for the child;

"(ii) Provide care and control for the child; and

"(iii) Maintain an adequate parental relationship with the child.

"Physical custody of the child by the parent or parents for insubstantial periods of time during the required two-year period will not serve to interrupt the running of such period. . . ."

All further statutory references are to the Civil Code unless otherwise indicated.

The father contends that the evidence was insufficient to support the judgment terminating his parental rights and that the court erred in failing to consider a plan for reunification. The minor, represented by independent counsel, does not argue that she should be placed in her father's custody. Rather, she contends that termination of parental rights freeing her for adoption by her foster parents placed at risk her potential inheritance rights through her natural mother and thus was not the least detrimental alternative, and that the court's rulings related to the disclosure of her inheritance rights constituted reversible error. The father joins in the minor's contention that the court inadequately protected the minor's financial interests and erred in its rulings.

We affirm the judgment with directions intended to clarify the status of the minor's financial interests.

## I. *Standard of Review for Judgment Terminating Parental Rights*

As a reviewing court, we do not exercise our independent judgment on or reweigh the evidence, but merely determine whether there is sufficient evidence to support the findings of the trial court. (*In re Laura F.* (1983) 33 Cal.3d 826, 833 [191 Cal.Rptr. 464, 662 P.2d 922]; *In re Angelia P.* (1981) 28 Cal.3d 908, 924 [171 Cal.Rptr. 637, 623 P.2d 198]; *In re Robert J.* (1982) 129 Cal.App.3d 894, 901 [181 Cal.Rptr. 188]; *In re Marcos S.* (1977) 73 Cal.App.3d 768, 781 [140 Cal.Rptr. 912].)

Although the focus of section 232, subdivision (a)(7), is on the parent's behavior *during* the period of foster care and the likelihood of failure or success in the future, ". . . a measure of a parent's future potential is undoubtedly revealed in the parent's past behavior with the child. [Citations.]" (*In re Laura F., supra,* 33 Cal.3d at p. 833.) In the case before us, the minor had been in foster care for nearly six and one-half years at the time of the hearing on the petition in March 1981—from the time she was one and a half years old. Therefore, Manuel's background and relationship with the minor from the time of her birth have relevance in assessing his present ability to provide a home and adequately parent the minor.

Subdivision (a)(7) of section 232 directs that the court must find that the minor comes within the statutory description by clear and convincing evidence. (See also *In re Angelia P., supra,* 28 Cal.3d 908, 915-922.)

## II. *Sufficiency of the Evidence for Terminating Parental Rights.*

*Family Background.* The following facts appear in the juvenile court records in the dependency proceedings for the minor and in the probation

officer's report of March 9, 1981, prepared in compliance with section 233, both of which were admitted into evidence at the hearing.

The minor was born on May 29, 1973, of a mother, Sally M. S., who had a history of drug involvement and emotional disturbance, and a father, Manuel G., who had an extensive criminal record and history of drug involvement. The three lived with Manuel's mother, Rose, until November 1974, when Sally decided to terminate her relationship with Manuel and to place the minor for adoption. Rose physically removed the minor from the home to avoid having this plan carried out. Ultimately the minor was taken into protective custody, Sally was hospitalized, and the parents each sought legal custody of the minor.

On November 21, 1974, a dependency petition was filed on behalf of the minor. On December 3, 1974, the parties reached an agreement whereby they voluntarily placed the minor in foster care pending their custody proceedings; the dependency petition was not dismissed.

The minor resided at the San Francisco Youth Guidance Center from November 19, 1974, to December 11, 1974, when she was placed in a foster home in San Mateo County. This placement worked poorly because the foster parents, in disregard of the child welfare worker's instructions, dealt directly with Manuel and Rose regarding visitation. The situation deteriorated, and the minor was removed from this home.

On May 2, 1975, the minor was placed in a new foster home, where she has resided to the present time with foster parents who desire to adopt her. Visitation with Manuel was arranged outside the foster home and, in an apparent attempt to avoid the problems which had arisen in San Mateo, he was not given the San Francisco address and telephone number of the foster home.

On June 18, 1975, the child welfare worker requested that dependency be declared. This was accomplished on July 28, 1975, and the minor was committed to the DSS for placement, which was continued with her foster parents.

DSS lost contact with Sally until September 1976, when she reappeared, revealed that she had married in March 1976, and indicated that she was interested in regaining custody of the minor. The mother appeared to have stabilized her life significantly. Her husband was a business person who encouraged Sally to enroll in a nursing program and supported her efforts to renew her relationship with the minor. They travelled monthly from their

home in Los Angeles to San Francisco for visits with her, and DSS considered a reunification plan with the mother.

In July 1977, Sally informed the child welfare worker that she had been accepted into nursing school and thought it was important that she obtain employment skills before taking custody of the minor. She said she wanted to continue the monthly visits and maintain the relationship, but she stopped visiting the minor after August 1977. Sally and her husband were divorced in December 1978. She then told the child welfare worker that she wanted to relinquish the minor for adoption. Sally executed a formal relinquishment document on February 6, 1980.

Manuel was regular in visitation with the minor from 1974 to 1980. He visited every other week until 1978, when the foster family moved from San Francisco to Lake County, and visitation was changed to one overnight visit per month. Arrangements were made for a weekly phone call between Manuel and the minor.

In 1978, the court denied Manuel's petition requesting that custody of the minor be returned to him. Scheduling problems which arose with Manuel's visitation were resolved by court order of December 17, 1980, permitting him one monthly visit from noon to 5:30 p.m. The petition to terminate the parental relationship was filed in April 1980.

*The father.* Manuel, born in October 1932, had served approximately eight years in prison for various offenses before he was convicted of second degree murder in October 1962. His sister Mary was convicted of involuntary manslaughter at the same time. They were both narcotic addicts, had been selling and furnishing heroin, and had furnished the victim with drugs with which she fatally overdosed. He served 10 years in prison for the murder conviction and was released at age 39 on June 2, 1972. Two days later he met and began living with Sally, the minor's mother, and the minor was born about a year later.

Manuel in August 1972 applied for aid to the disabled (ATD) and was granted benefits based upon the report of a clinical psychologist to whom he had been referred for evaluation of his eligibility. The psychologist found that Manuel had an I.Q. of between 90 and 100 and diagnosed him as having paranoid schizophrenia, acute and chronic, severe, with symptomatic agitation and depression. The psychologist indicated that Manuel was not employable for the foreseeable future, but that with intensive, individual psychotherapy he had some chance of being employable in the future.

After dependency of the minor was determined in July 1975, regular reviews were held, and probation reports were submitted in May 1976, April

1977, November 1977, March 1978, April 1979, and March 1980. Routinely, the probation workers (five different individuals) reported that Manuel was unemployed, although he claimed in 1980 that he went to the union hiring hall nearly every day. During this time he received supplemental security income (SSI) as a result of his emotional disability. He had no permanent home. At times he lived with his mother; at other times he lived in a hotel or room, but spent a major portion of his time at his mother's and usually received mail at her house.

The reports regularly affirmed that Manuel's love for the minor and desire for visitation with her were constant, but that he displayed a very limited understanding of the minor's needs and little if any ability to parent effectively.

*The minor.* Clinical psychologist Marjorie Baker saw the minor in June 1979 and again in August 1980 and prepared written reports on both occasions. Educational psychologist Dell Sokol worked with the minor for six months in once-a-week play therapy and prepared a written evaluation of the minor in February 1981. Both psychologists testified at the hearing.

Dr. Baker in 1980 found that the minor was suffering from "Overanxious Disorder of Childhood" as well as a sensory-motor problem, neither of which were irremedial. She stated that the minor "appears to feel herself a part of the S. . . . [foster] family and to have formed an identification, or bond, with Mrs. S. . . . Jackie [the minor] seems to derive no pleasure from her visits with her natural father and appears to derive some pleasure at the prospect of the visits being terminated. They seem to serve no useful function for her at the present time. She also wants to be adopted by the S. . . .s, and this would give her a feeling of more security." Dr. Baker testified that the minor had formed a psychological bond with the foster parents and that it would be detrimental to the minor to remove her from their custody.

Dr. Sokol in her February 1981 report made observations and recommendations similar to those of Dr. Baker. At the hearing, Dr. Sokol conceded that a child might feel guilt about her natural family after adoption, but she testified that removal from her foster family of the minor in this case "would be emotionally destructive, would add to her feelings of insecurity. It would greatly increase her anxiety. It would diminish her trust for people in general." This would probably result even if the child were placed with her biological father.

The probation officer's report of March 9, 1981, also discussed the minor's desire for adoption: "Jackie's concept of adoption is that she will be

able to stay with her current foster family permanently, and also that adoption would terminate her visits with her father and his family. She is very aware of the fact that her father and paternal grandmother do not want her to be adopted. When asked how she felt about the possibility of not being able to continue to see her father if she were adopted, Jackie replied that she visited with her father only because she has to, and not because she wants to. [¶] Jackie was definite in her statement that she wants to remain in her current foster home and be adopted."

The probation officer acknowledged Manuel's strong and genuine feelings for his daughter, but she recommended pursuant to section 233 that terminating his parental rights and referring the minor to DSS, a licensed adoption agency, for adoptive planning would be in the best interests of the minor.

*Reunification.* Manuel has never had the sole care or custody of the minor. Her overnight visitations with Manuel have taken place in the home of Rose, Manuel's mother, or other relatives. The record is devoid of any indication that Manuel has ever had a home of his own—certainly not since the birth of the minor, although he at one time applied for public housing. The probation reports are replete with admonitions from the probation workers to Manuel that he had to stabilize his own life before the minor's custody could be entrusted to him. It is evident that he has made some progress, but not enough to categorize him as an adequate parent or provider. The record reflects that Manuel's primary goal is to maintain contact with the minor through visitation and that the minor does not share that goal.

*The court's decision.* The court found by clear and convincing evidence that the minor had been in a foster home for over two years, that Manuel had failed and was likely to fail in the future to provide a home for the minor, to provide care and control for her, and to maintain an adequate parental relationship with her, that an award of custody to the father would be detrimental to the child, that award of her custody to a nonparent would be in her best interests, and that termination of the parental relationship would be the least detrimental alternative available. The court also concluded that although Manuel "has love and affection for Jacqueline . . . he has only the ability to carry on visitation with her but with little understanding of her actual needs. Since 1974 he has been unable to come up with a plan to provide a suitable home for both of them. . . ."

The evidence is more than sufficient to support the trial court's findings and judgment terminating parental rights under section 232, subdivision (a)(7).

At the time of the hearing, there was no statutory directive to consider a plan for reunification as an alternative to termination of parental rights. Under case law, however, an increase in protective services was an alternative to be considered, but it was not mandatory. (See *In re Robert J., supra,* 129 Cal.App.3d 894, 903, fn. 4.) It is evident that the court considered the minimal efforts made by Manuel to establish a home for the minor and develop parenting skills, as well as his potential for change in the future. Again, the evidence supports the court's rejection of such a plan.

III. *Rulings Relating to Minor's Inheritance Rights*

The minor, joined by Manuel, advances several arguments to support her contention that the trial court erred in its rulings related to the disclosure of information about her inheritance rights.

*Discovery order.* Shortly after the petition for termination of parental rights was filed, counsel for Manuel moved for discovery of the complete records of DSS. In his supporting declaration, he alleged that the files presented to him had portions deleted. The juvenile court judge (John Benson) reviewed the files, granted discovery of certain information relating to the father, and denied discovery of a portion of the deleted material (relating to the family trusts) on the ground that it had no significant bearing on whether parental rights should be terminated, i.e., it was not relevant. Because of his knowledge about the family trusts, he disqualified himself from hearing the petition for termination and had the documents relating to the minor's potential inheritance rights placed in an envelope marked confidential and sealed by order of the court.

The matter was assigned to Judge Francis Mayer for trial on March 9, 1981. Judge Mayer initially refused to review the contents of the sealed envelope himself or to disclose its contents to counsel. Existence of trusts established by the natural mother's maternal grandparents came to light during the testimony of one of the probation workers, and the court ruled that all information in the sealed file be revealed to all counsel. The file contained a letter dated in July 1979 from a law firm representing a New York trustee who was attempting to locate the minor, who "has a vested interest in a very substantial Trust." Information in the file alluded to the fact that Judge Benson had been in touch with the legal representatives of the trustee. The file, however, contained no specific information about the trusts or the minor's interest in them.

Judge Mayer, with the consent of counsel, contacted the lawyers for the trustee and eventually received from a New York lawyer, William D. Zabel, who had been appointed guardian ad litem for the minor in the New York

court proceedings, various documents explaining the nature of the trusts and the litigation among family members about the trusts. The documents were made available to Manuel's counsel and to the minor's counsel, who had been appointed for her in June 1980 at the request of the counsel for the DSS, and the hearing was continued.

The minor contends that Judge Benson erred when he denied discovery of the trust information contained in the sealed file. We agree with Judge Benson that this information was not relevant on the issue of termination of parental rights. But the information was relevant on whether the court should exercise its discretion to refer the minor to an agency for adoptive placement, and it should have been released to counsel, particularly to counsel appointed to represent the minor. Financial considerations have always been a factor properly considered by a court in determining the best interests of the child. (See, e.g., *Foster* v. *Foster* (1937) 8 Cal.2d 719, 732 [68 P.2d 719]; *Guardianship of Walsh* (1950) 100 Cal.App.2d 194, 197 [223 P.2d 322, 22 A.L.R.2d 689]; *Harris* v. *Harris* (1960) 186 Cal.App.2d 788, 799 [9 Cal.Rptr. 300].) Sections 232 and 233 both mandate that the court consider the best interests of the child.

The trial court, however, granted discovery during trial and expedited obtaining more complete information. Further, the hearing was continued for a month to give the parties an opportunity to assess the import of the child's potential inheritance rights. When the hearing resumed, counsel for the minor and Manuel were able to recall witnesses. They explored whether the foster parents, who had known of the potential inheritance rights, were influenced by those rights in their decision to adopt the minor. They examined the deputy city attorney and others relating to the discovery of the trusts, the sealing of records, and Judge Benson's role.

Any error in the initial denial of discovery was cured.

*Continuance.* The minor contends that the court failed to grant a continuance for a sufficient time to investigate adequately the minor's interests in the New York trusts. She fails to cite us to any place in the record where counsel for either the minor or Manuel requested an additional continuance, and we can find no such request. Section 232.3, subdivision (c), directs that continuances shall be granted only upon a showing of good cause and only for that period of time shown to be necessary by evidence considered at hearing on the written motion for a continuance. The trial court, by not continuing the matter *sua sponte* for a longer or additional period, did not abuse its discretion.

*Refusal to call Judge Benson as a witness.* The trial court declined to call Judge Benson or to allow counsel to subpoena him as a witness to testify

about his communications with the New York lawyers on the ground that such testimony would be irrelevant to the issues before the court. Conceding that the testimony would be hearsay, the minor's counsel opined that Judge Benson might shed light on whether the minor's mother was pressured by the M. family into relinquishing her for adoption and on inconsistencies in the sealed documents about the vested or contingent nature of the minor's inheritance rights. Sally's motives for the relinquishment are irrelevant. The documents obtained through the trial court's efforts contained far more information than the minimal information in the sealed records, and it is difficult to see what hearsay evidence from Judge Benson could have added, even though the parties waived hearsay objections. The court properly excluded the evidence. (Evid. Code, § 1200.)

*Impact of the rulings.* The minor argues that the court's rulings denying discovery of DSS records and other information about the trusts resulted in ineffective assistance of counsel and denial of due process. She relies on *In re George G.* (1977) 68 Cal.App.3d 146, 159 [137 Cal.Rptr. 201], to support her contention that the exclusion of the evidence prevented her counsel from testing the reliability and accuracy of the probation report. *George G.* is inapposite. There, the court held that it was error to deny discovery of information that would enable counsel to test the hearsay statements contained in the probation report. Here, the minor concedes, as she must, that the report contained no reference to the trusts and that her counsel was able to recall witnesses after he received the trust information. The minor was denied neither due process nor effective assistance of counsel because of the rulings in question.

### IV. *The Minor's Potential Inheritance Rights*

The main thrust of the minor's appeal is that the court gave inadequate consideration to the less detrimental alternative of a guardianship as opposed to termination of parental rights and referral for adoption. Manuel, agreeing with these arguments, points out that guardianship would also enable him to continue visitation with the minor.

The minor's natural mother, Sally S., is one of two adopted daughters of Audrey S., who in turn is one of three children of Otto M., Sr., who died in 1963, and Agnes M., who died in 1974, both residents of New York. Otto M., Sr., and his wife, Agnes M., during their lifetimes created several *inter vivos* trusts and, at their deaths, testamentary trusts for the benefit of their three children: Audrey S., Otto M., Jr., and Henry M., the two sons being named trustees of each of the trusts. The assets of the various trusts consisted solely of shares in a family-owned holding company owning in-

vestments in real and personal property worth at least several million dollars.

A conflict arose between Audrey S. and her two brothers, the trustees, over (1) accountings and distribution of income, (2) outright ownership of 36 shares of the holding company, and (3) the status of the two adopted daughters of Audrey S. as remainderpersons of the various trusts. A compromise agreement was reached requiring court approval, and at that point a guardian ad litem, William D. Zabel, an attorney, was appointed by the Surrogate Court, County and State of New York, to represent the interests of Jacqueline and any unborn issue of Sally or her sister, Agnes S., as contingent remainderpersons.

Zabel prepared a 51-page "Report of Guardian ad Litem" with attached exhibits showing the nature of the minor's interests in the trusts established for Agnes S. and Sally S. and the impact of the settlement transactions upon the interests of the minor in all the trusts for presentation to the New York court.

Zabel sent to the San Francisco court a copy of the agreement of compromise and settlement and various other documents to be submitted to the New York court for a hearing scheduled in March 1981. He did not, however, send a copy of the sealed accounting showing the value of the corpus of the various trusts, nor did he send a copy of the actual trust instruments.

The most important document sent by Zabel was a copy of a 1981 irrevocable trust agreement with a corpus of $100,000 for the minor in which the minor's maternal grandmother, Audrey S., was named as donor; the trust agreement was not conditioned on a waiver of the minor's contingent interest in the other trusts. The photocopy of the trust agreement showed the signature of the donor, but no acknowledgment before a notary public, and the name of the trustee was noticeably lacking. This trust agreement was attached to the "Report of Guardian ad Litem," and *presumably* the completed, executed trust agreement was presented to the New York court for approval as part of the compromise settlement. But no confirmation of this fact by Zabel appears in the record before us.

The guardian ad litem's report on the minor's rights and interests in the trusts is exhaustive, and is summarized in his letter to the trial court dated April 2, 1981. He stated: (1) Termination of Manuel's parental rights would have "no effect" upon the minor's rights in the trusts. Similarly, Sally's relinquishment of her parental rights "would appear to have no effect on Jacqueline's rights." (2) "Any subsequent adoption of Jacqueline by a family in California should also have no effect upon her rights in these New

York trusts." (3) The minor's rights in the trusts "are extremely remote." She would take only if her mother and her grandmother fail to exercise certain so-called "powers of appointment" over the principal of the trusts. Furthermore, she would take the principal of the largest trust only if her mother (then age 31) predeceases her grandmother (then age 67). Even if the nonexercise of powers and the unusual order of death occur, the minor's rights have an actuarial value of "only approximately $75,000." (4) The creation of the $100,000 irrevocable educational trust for the minor would not result in a forfeiture of any of her contingent rights in the trusts.

Thus, even if the section 232 proceedings should adversely affect the minor's rights under the trusts, the educational trust would protect her interests in an amount greater than the present value of her interests in the family trusts.

The guardian ad litem's conclusion that termination of the parental relationship and subsequent adoption out of the M. family would not adversely affect the minor's interests in the family trusts was predicated upon his view that distribution of the trusts would be governed by New York law, which is favorable on inheritance rights of adoptees from their natural families, rather than California law, which is unfavorable.

The guardian ad litem's doubts about California law protecting the minor's interests in the trusts after adoption were well-founded. Probate Code section 257 (eff. until Jan. 1, 1985; see Prob. Code, § 6408, eff. Jan. 1, 1985) provided that an adopted child "does not succeed to the estate of a natural parent . . ., nor . . . to the estate of a relative of the natural parent, . . ." In *Estate of Russell* (1971) 17 Cal.App.3d 758 [95 Cal.Rptr. 88], Division One of this court held that Probate Code section 257 and the public policy of this state as reflected in the various adoption statutes precluded a child who was born after the testator's death from recovering a share of a testamentary trust as a " 'child . . . or issue surviving' " a primary beneficiary. (*Id.,* at pp. 766-770; cf. *Estate of Haneberg* (1971) 19 Cal.App.3d 643 [96 Cal.Rptr. 807] [reaching a different result because the trust was established in 1926, prior to the 1955 amendment of Prob. Code, § 257, and the law at that time permitted children adopted out of the family to inherit from their natural grandparents]; see 7 Powell & Rohan, Powell on Real Property (1984) § 1006, p. 699; Comment, *Complete Transplantation of the Adopted Child—A Plan for California* (1967) 18 Hastings L.J. 377; 6 Witkin, Summary of Cal. Law (8th ed. 1974) Parent and Child, § 179, p. 4689.)

The guardian ad litem's report included extensive discussion of New York statutory and decisional law on an adoptee's inheritance rights and his opin-

ion that New York law is favorable to the minor's position.[2] He does concede, however, that the precise question of the rights of a minor in Jackie's position has never been decided by that state's highest court and that her status as a natural child, rather than "'lawful issue,'" may preclude her right to inherit.[3] It is for this reason, as well as the fact that the minor's rights under the trusts were contingent and remote, that he secured the creation of the educational trust in her favor.

The court prepared a six-page decision in which it summarized the guardian ad litem's report and stated that ". . . in all likelihood the minor's contingent interests under these trusts will be unaffected by her adoption . . ." and that in view of the fact "that the maternal side of the family has shown little interest in Jacqueline's welfare . . ., it can be concluded that the situation created by section 257 of the Probate Code will cause little detriment to Jacqueline if she is adopted."

The minor's argument that the guardian ad litem misconstrued New York law misses the point. The guardian's opinion appears to have been well founded. But even if it proves wrong, this would not render the trial court's decision to terminate the parental relationship error on the record before it.

Perfect certainty of preservation of the minor's financial interest in the trust was not required; all that was needed to support the judgment was a showing by clear and convincing evidence that the minor came within the description of section 232, subdivision (a)(7), and that termination was in

---

[2]"Section 117 of the [New York] Domestic Relations Law ('DRL'), entitled 'Effect of Adoption,' provides, in pertinent part, as follows:

"'1. . . . The rights of an adoptive child to inheritance and succession from and through his [or her] natural parents shall terminate upon the making of the order of adoption except as hereinafter provided.

"'2. This section shall apply only to the intestate descent and distribution of real and personal property and *shall not affect the right of any child to distribution of property under the will of his [or her] natural parents or their natural or adopted kindred* whether such natural parent or kindred shall have died heretofore or shall die hereafter or under any inter vivos instrument *heretofore or hereafter* executed by such natural parent or his or her kindred.' (Italics added)

"This provision of the DRL, effective in 1964, manifests a clear legislative intent that the removal of the adopted child from the bloodlines of his [or her] natural family for purposes of intestate succession does not affect his [or her] right to inherit from his [or her] natural family under *inter vivos* instruments or wills, whether executed before or after March 1, 1964.[8]" The guardian ad litem's footnote 8 provides: "See note of Temporary State Commission on the Law of Estates, 1966 N.Y. Laws at p. 11."

[3]One of the main conflicts among the M. family members was the adopted status of the minor's mother, Sally M. S., and Sally's sister. A memorandum submitted to the New York court in support of a compromise agreement that Sally and her sister would be deemed lawful issue in the M. family was less optimistic about the favorable interpretation of New York law. The agreement to treat Sally as lawful issue did, however, remove one impediment to the minor's realizing her potential inheritance rights.

her best interest. Financial factors were but one aspect to be considered. As found by the trial court, "Any uncertainty as to her rights to take under the New York trusts should not prevent securing a permanent home with people she has lived with since 1975 and whom she looks upon as her natural parents."

It is clear that the trial court carefully weighed the remote possibility of future financial benefit to the minor against her immediate need for a childhood untroubled by insecurity and anxiety before making its determination to protect her present well-being. The minor's contention (through counsel) that the court failed to give proper consideration to a guardianship as the least detrimental alternative is not supported by the record. We find no abuse of discretion in the court's decision to terminate parental rights and refer the minor for adoption.

## V. *Further Consideration of the Minor's Financial Interests*

Counsel have unduly confused the issues on appeal by failing to distinguish between the judgment terminating parental rights and the order referring the minor to an agency for adoptive placement.

First of all, we are unable to fathom how termination of the father's parental rights could have any effect on the minor's right to inherit through her maternal line. The crucial step is severing the minor's legal ties with her natural mother, which will be accomplished only by a final judgment of adoption. (§§ 228, 229.) Even Sally's relinquishment of her minor daughter only terminated her rights and obligations as a natural parent. (§ 224m.) It did not extinguish the parent-child status or the minor's right to inherit through her mother. (See 10 Ops.Cal. Atty.Gen. 253, 255 (1947) ["[T]he apparent purpose of the Legislature in enacting [statutory provisions on relinquishment] was to facilitate adoption procedure and fix responsibility of the parties thereto, not to amend the laws of inheritance."].)

Second, an order referring the minor to an agency for adoptive placement is only an interim order—a preliminary step in proceedings that may or may not culminate in a final judgment of adoption. It must be followed by a petition for adoption (§ 224n) and a court hearing on the petition. At the hearing, the court may render a judgment of adoption ". . . [i]f satisfied that the interest of the child will be promoted by the adoption, . . ." (§ 227; see generally 6 Witkin, Summary of Cal. Law, *supra,* Parent and Child, § 204 et seq., p. 4709 et seq.)

Thus, there is additional time before a petition for adoption is granted to explore the parameters of the minor's inheritance rights through her mother

and, specifically, to clarify the status of the $100,000 educational trust allegedly created by the minor's maternal grandmother. The court that hears the adoption petition properly should reconsider these issues in determining whether "the interest of the child will be promoted by the adoption." (§ 227.)

If the court hearing the adoption petition determines that the minor's best interests mandate denial of the petition, guardianship proceedings can be instituted by the foster parents. ▇ ▇▇ ▇ Termination of Manuel's parental rights assures that the guardians and the minor will be unfettered by the requirement of continued contact with the father through forced visitation with the minor.[4]

## VI. *Disposition*

The judgment terminating parental rights is affirmed. The court is directed to appoint independent counsel for the minor for the purpose of clarifying the status of the $100,000 educational trust, e.g., ascertain that it is in existence, and, if so, obtain the name and address of the trustee, the description and location of the assets, and copies of all accountings. (§§ 237, 237.5.) Counsel should also be directed to obtain a copy of the trust instrument for each trust in which the minor has an interest, to review those instruments in conjunction with the report of the New York guardian ad litem, and to report his or her recommendations to the court hearing the adoption petition.

White, P. J., and Scott, J., concurred.

---

[4]Although adoption is to be preferred over guardianship (e.g., *San Diego County Dept. of Pub. Welfare* v. *Superior Court* (1972) 7 Cal.3d 1, 9 [101 Cal.Rptr. 541, 496 P.2d 453]), the latter is proper where it is in the child's best interests. (*Id.*, at p. 13; see Comment, *Recent Trends in California Law Concerning the Best Interests of the Child* (1973) 1 Pepperdine L.Rev. 89; see also 10 Ops.Cal.Atty.Gen. 253, *supra*.)